# THE COMMISSIONERS OF PARKS AND BOULEVARDS OF THE CITY OF DETROIT v. THE COMMON COUNCIL OF THE CITY OF DETROIT ET AL.

*Belle Isle bridge—Custody and control of.*

| 80 | 663 |
| 95 | 182 |
| 80 | 663 |
| 104 | 328 |
| 80 | 663 |
| 122 | 380 |
| 80 | 663 |
| e128 | 361 |

1. The charter of the city of Detroit divides the powers of local government into two departments,—legislative and administrative. The legislative authority is vested in the common council, and the administrative powers are conferred upon the mayor and different agencies, such as the board of public works, board of water commissioners, and the commissioners of parks and boulevards.

2. The common council of the city of Detroit has *full* control over Belle Isle bridge, which was constructed pursuant to an act of Congress approved July 20, 1886 (24 U. S. Stat. at Large, 147). Such control must be exercised through ordinances, duly enacted for that purpose, which may provide all needful rules and regulations for the use of the bridge and the approaches, and may authorize the hiring of such employés in and about the bridge as the council deem expedient, and may fix their compensation.

3. So much of section 11 of Act No. 388, Local Acts of 1889, as confers upon the commissioners of parks and boulevards the authority to make all suitable and needful rules and regulations respecting the use of Belle Isle bridge and its approaches by foot-passengers, etc., cannot be upheld, as it places in the hands of an administrative body legislative authority which is vested by the charter in the common council of the city of Detroit.

4. The commissioners of parks and boulevards of the city of Detroit are the proper administrative body to have the custody and control of Belle Isle bridge, under the general direction of the common council of the city, as exercised through ordinances enacted for that purpose, and to that end may hire the necessary employés, who are subject to the supervision and control of said commissioners.

*Mandamus.* Submitted April 29, 1890. Granted, in part, May 16, 1890.

Relators applied for *mandamus* to compel the common council of the city of Detroit to rescind their action in the appointment of their co-respondents as superintendents, etc., of Belle Isle bridge, and to turn over its control to relators. The facts are stated in the opinion.

*Dickinson, Thurber & Stevenson* (*Don M. Dickinson*, of counsel), for relators.

*John W. McGrath*, for respondents.

[The points of counsel are fully stated and discussed in the opinion.—REPORTER.]

LONG, J. This is a petition for *mandamus* to compel the common council of the city of Detroit to rescind and set aside their action appointing certain persons, who are also made parties hereto, as superintendent, assistant superintendents, engineers, assistant engineers, gate-tenders, and sweepers of Belle Isle bridge and its approaches, and to turn over the possession and control of said bridge to the relators, and also commanding such superintendent, assistant superintendents, engineers, assistant engineers, gate-tenders, and sweepers to surrender their positions so held by them under the action of the common council.

Upon filing the petition in this Court, an order to show cause was issued, and the parties have all appeared and answered. Substantially the facts set out in the petition are admitted; the controversy between the parties being purely questions of law arising out of the construction of the statute of the United States authorizing the construction of the bridge over the navigable waters of the Detroit river, and the statutes of this State authorizing the common council of the city of Detroit to borrow money for its construction, and appointing the commissioners of parks and boulevards. The act of Congress

(24 U. S. Stat. at Large, 147) was approved July 20, 1886, and reads as follows:

" An Act to provide for the construction of a bridge across the west channel of the Detroit river to connect Belle Isle park with the main-land.

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the assent of Congress is hereby given to the municipality known as the ' City of Detroit,' a body corporate existing by and under the laws of the State of Michigan, to erect a bridge across the Detroit river between any point on the north-western bank of said river within the limits of said corporation aforesaid, and the island in the Detroit river heretofore known as ' Belle Isle,' and now known and designated as ' Belle Isle Park,' the said bridge to be devoted to such general use as may be prescribed by the municipal authorities of the city of Detroit.

" Sec. 2. That the bridge authorized to be erected by this act shall be so located and constructed that the channel of said Detroit river shall not be unreasonably obstructed, but that a draw or pivot span of not less than one hundred and twenty-five feet clear opening on each side of the pivot-pier shall be located over the above-specified channel, in such a manner that one or both of the openings of said draw or pivot span can be conveniently and safely reached and passed by boats pursuing the ordinary channel of the river; that one opening, at least, of a draw or pivot span shall be over the best and most convenient channel of the river for such classes of river traffic as shall find it convenient to use said channel.

" Sec. 3. That the height at which said bridge shall be constructed above the surface of the river shall be such as may be approved by the Secretary of War.

" Sec. 4. That all draw or pivot spans authorized by this act shall be operated by steam or other reliable mechanical power, and shall be opened promptly upon such signals as are now prescribed by law for the passage of boats through draw or bridges, and such other and further regulations as may be prescribed in the premises.

" Sec. 5. That piers upon which said bridge is built shall be parallel with the current of the river, and so as to avoid producing cross-currents or bars dangerous to navigation; and if, after construction, any piers are found to produce the above-mentioned effects, the nuisance shall be abated or corrected by, or at the expense of, the corporation owning or operating said bridge, and when advised by the Secretary of War.

" Sec. 6. That it shall be the duty of the municipal corporation authorized to erect a bridge under this act to maintain, at its own

expense, from sunset to sunrise of each day throughout the season of navigation, and during heavy fogs, such lights on the bridge as may be required by the Light-house Board, for the security of navigation.

"SEC. 7. That any bridge constructed under this act, and according to its limitations, shall be a lawful structure, and shall be recognized and known as a post-route, over which the mails, troops, and munitions of war of the United States may be transported at no higher charge than is made for transportation of said mails, troops, and munitions of war over railroads and public highways leading to said bridge; and the United States shall have the right of way for postal telegraph lines and appliances across said bridge.

"SEC. 8. That before commencing work on the bridge contemplated in this act it shall be the duty of the municipal authorities of the city of Detroit, to submit to the Secretary of War, for his examination, a design and drawing of the bridge and piers, and a map of the location, giving, for the space of one-half mile above and one-half mile below the proposed location, the topography of the banks of the river, the shore lines at high and low water, the direction of the current, and soundings showing accurately the bed of the stream, and such other and further information as the Secretary of War may require for a full and satisfactory understanding of the subject.

"SEC. 9. That, when the Secretary of War is satisfied that the provisions of this act have been complied with in the matter of location and the submission of plans, the building of the piers may at once commence; but, if it shall appear that the conditions prescribed by this act cannot be complied with at the location where it is desired to construct the bridge, the Secretary of War shall, after considering all remonstrances filed against the building of said bridge, and furnishing copies of remonstrances to the board of engineers provided for in this act, detail a board of experienced engineers from the engineer corps of the United States army to examine the case, and may, on their recommendation, authorize and direct such modifications as appear necessary.

"SEC. 10. That the Secretary of War may, in his discretion, appoint one or more army engineers to supervise and personally examine the construction of said bridge; and that the proposed bridge shall only be a lawful structure when built as approved by the Secretary of War, who shall have authority, by and with the advice of the engineers detailed by him, to order such change in construction or appliances as he may deem necessary for the safety of said bridge and the convenience of navigation.

"SEC. 11. That in case of any litigation from any obstruction, or alleged obstruction, to navigation, created by the construction of any bridge under this act, the cause or question arising may be

heard by the district court of the United States of any state in which any portion of said obstruction or bridge touches.

"SEC. 12. That the municipal laws and ordinances of the city of Detroit may be enforced on said bridge, and the care, control, and the use of the same shall be governed by ordinances of the city enacted, as though said bridge was a public street in said city.

"SEC. 13. That the right to alter, amend, or repeal this act, and to require the removal of material obstructions to navigation, by the construction of any bridge under its provisions, is hereby expressly reserved, without any liability of the government for damages on account of such alterations, amendment, or repeal, or on account of the prevention, or the requiring of the removal of any such obstruction; and if any change be made in the plan of any bridge constructed under this act, during the progress of the work thereon, or before the completion of said bridge, such change shall be subject to the approval of the Secretary of War; and any change in the construction, or any alteration of any such bridge, and the removal of any such obstruction, that may be directed at any time by Congress or the Secretary of War, shall be made at the cost and expense of the owners of the said bridge."

It appears that on May 21, 1889, George H. Russell, William Livingstone, Jr., John Erhard, and William K. Parcher were appointed by the common council, on the nomination of the mayor, commissioners of parks and boulevards, in accordance with an act (No. 388, Local Acts of 1889) entitled—

"An act supplemental to the charter of the city of Detroit, and relating to parks, boulevards, and other public grounds in said city, and to repeal act number three hundred and seventy-four of the Local Acts of 1879, entitled 'An act to provide for the establishment and maintenance of a broad street or boulevard about the limits of the city of Detroit, and through portions of the townships of Hamtramck, Greenfield, and Spring-wells, in the county of Wayne,' approved May 21, 1879."

The commissioners duly qualified under the act, and entered upon the discharge of their duties. On August 12, 1889, the common council, assuming authority over the commission in the custody and control of the bridge connecting Belle Isle park with the main-land of the city (which bridge had then been constructed, as will be

noted hereafter), without the assent or concurrence of
the commission, and against their protest, formally
appointed for the bridge one superintendent, one assist-
ant superintendent, one engineer, four assistant engineers,
four gate-keepers, and two sweepers, fixing, in detail,
their salaries, which aggregate $11,300. These persons at
once entered upon the bridge, and have ever since main-
tained and held possession thereof, adversely to, and to
the exclusion of, the commissioners. The commissioners
continued to be excluded from the custody of the bridge,
and made formal demand upon each of the persons ap-
pointed by the council that they surrender and deliver
to them its custody and control. They also petitioned
not only the council as then organized, but after the
election and organization of the new council, on January
21, 1890, presented a formal petition to that body, setting
forth their claims, and asking that the action of the
council appointing such persons be rescinded, which was
refused. The commissioners claim that such rights are
conferred upon and vested in them by the provisions of
the act of 1889, before cited.

Section 11 of this act, and the other sections here
mentioned, are the ones under which the commissioners
claim:

" SEC. 11. The bridge connecting Belle Isle with the
main-land and its approaches shall, for the purposes of
this act, constitute a part of Belle Isle park, and
said commissioners shall have the custody and control of
the same, subject to the general directions of the common
council. Said commissioners may make all suitable and
needful rules and regulations respecting the use of said
bridge and its approaches by foot-passengers, by animals
and vehicles of every kind, including railway cars,
engines, or motors, and may prohibit the use of such
bridge by such persons, animals, cars, engines, or motors,
as in their judgment may be injurious to the proper use
of said bridge or park. They may appoint the necessary
engineers or bridge-tenders, and provide for the payment

of their compensation. But the making of repairs and the maintenance of said bridge shall be under the direction and supervision of the appropriate [department] departments of the city government, and subject to the authority of the common council, and the expense thereof shall not be made a charge upon said park fund."

Sections 6 and 7 of the same act, so far as they bear on the questions here, read as follows:

"SEC. 6. The commissioners shall have the control and management, and shall have charge of, the improvement of all the parks and public grounds of said city, including the Island park (known as 'Belle Isle Park'), and of such parks or public grounds as may hereafter be acquired, laid out, purchased, or dedicated for public use in said city. *    *    *    *    *    *    *    *    *    *

"SEC. 7. The said commissioners may make all needful rules and regulations for the management, maintenance, and care of the said parks, public grounds, and boulevard or boulevards, and regulate their use, and the common council of said city may provide, by ordinance, for the observance of the same, and may also, in like manner, provide for the observance and enforcement of any other rules and regulations duly made by said commissioners, under any of the provisions of this act. And said common council may, by ordinance, provide for the preservation and protection of the parks, public grounds, and boulevards, and any of the property in charge of said commissioners, against any destruction or injury,    *    * *    and prevent any disorder or disturbance.    *    *    * Said ordinances may provide for the punishment for any breach or violation of any of their provisions.    *    *    * The commissioners of metropolitan police for the city of Detroit, upon the request of said 'Commissioners of Parks and Boulevards,' shall detail for service, in any of the grounds under the charge of said park and boulevard commissioners, so many of the police force as may be necessary to maintain order and protect the property thereon, and any policeman on duty on said grounds may remove therefrom any person who may violate any of the rules and regulations of said commissioners, or of any of the ordinances of said city, adopted as aforesaid, relating to said parks, public grounds, or boulevards."

Some 10 years prior to this act, and under an act of

the Legislature approved May 27, 1879, the city of Detroit was authorized to purchase Belle Isle, and erect and maintain a bridge over the American channel between the island and the main-land; and under chap. 11, § 7 (Local Acts of 1883, p. 627), of an act to provide a charter for the city of Detroit, and to repeal all acts and parts of acts in conflict therewith, approved June 7, 1883, the said common council was authorized to borrow money " for the purpose of constructing a highway by bridge or tunnel, with suitable draws, sites, and approaches over or under the Detroit river:" provided, that all of said improvement bonds, issued for the purpose above expressed, of bridging the American channel of the Detroit river to Belle Isle, if the same shall have been or may be authorized by an act of the Legislature of this State, shall not exceed the sum of $500,000. Charter and Laws of City of Detroit, 1886, p. 120, § 7. The original board of park commissioners was created by an act (No. 246, Local Acts of 1883), approved March 28, 1883. Charter of Detroit, 242.

The contention and argument of counsel for the relators is that, under these legislative acts and the charter of the city of Detroit, this power of control is conferred upon the relators. This is based largely upon the construction of section 11 of the legislative act above set forth, and particularly upon the following words of that section:

"The bridge connecting Belle Isle with the main-land and its approaches shall, for the purposes of this act, constitute a part of Belle Isle park, and said commissioners shall have the custody and control of the same, subject to the general directions of the common council. Said commissioners may make all suitable and needful rules and regulations respecting the use of said bridge and its approaches by foot-passengers. * * * They may appoint the necessary engineers or bridge-tenders, and provide for the payment of their compensation."

The position of the relators is that the words, "gen-

eral directions of the common council," mean nothing more than would be implied if the words were not used; that they refer to the exercise of legislative power; and, in any view, cannot be attached to the subsequent and independent provisions for the exercise of a judgment as to the needs of any assistants, and, finding that, then for the appointment of engineers and bridge-tenders by the commissioners in the exercise of their administrative functions. That the charter itself provides that—

"The powers of local government possessed by said city are divided into two departments,—the legislative and administrative. No person or body belonging to one department shall exercise powers properly belonging to the other, except in cases expressly provided in this act." Charter of Detroit, 1886, p. 10 (Local Acts of 1883, p. 580, § 2).

That the care and custody of, and the keeping of, the conditions imposed by the act of Congress upon the permission to build a bridge, are administrative acts. That, in the theory of the park and bridge act, the board of commissioners may themselves perform all the duties of custodians, care-takers, and engineers without employing assistants; and that it is only when, on their responsibility and judgment, it shall be necessary to have assistants, that they may call in these aids. That is, that the relators having been nominated by the mayor, and confirmed by the council, it is an appointment by the council to the principal office of having the care, custody, and control of the bridge, with power under the statute to make all needful rules and regulations respecting the use of the bridge and its approaches, and to appoint the necessary engineers or bridge-tenders, and provide for the payment of their compensation, and that the council now seek to supersede the necessary and essential attribute of the commissioners' authority to the proper custody and control thereof, or, as counsel for relators expresses it,

"the council in due form elect the board to an office, and then deny the office to its own appointee."

It is, on the other hand, contended by the respondents that the bridge was constructed by the city of Detroit under a grant of authority from the general government, and that by such grant the common council of the city of Detroit was vested with the care, custody, and control of said bridge; that the boulevard referred to in the petition terminates at the northerly line of Jefferson avenue, and does not extend to the northerly end of the bridge; that the northerly end of the bridge is over 300 feet southerly from the southerly line of Jefferson avenue; that the city of Detroit is the owner in fee, acquired by purchase, of a strip of land 150 feet in width, and extending from the southerly line of Jefferson avenue to the northerly end of said bridge; that said strip of land is not a public street or public highway, and not a part of the boulevard, and has never been declared by the council to be a part of the boulevard, or a public street or highway; that the act of the Legislature under which the relators claim to act is unconstitutional and void; that section 11 of the act above referred to, and certain sections of which are above set out, and under which the commissioners claim the care, custody, and control of the bridge, is ambiguous, inconsistent, inoperative, unconstitutional, and void, and that the common council cannot be divested of the custody, care, and control of the bridge in this proceeding. Counsel for respondents refers to certain sections of the act of Congress authorizing the construction of the bridge as sustaining these views. Attention is called to section 12, which provides:

"That the municipal laws and ordinances of the city of Detroit may be enforced on said bridge, and the care, control, and the use of the same shall be governed by ordinances of the city enacted, as though said bridge was a public street in said city."

It is further contended that, the Detroit river being a navigable water-way of the United States, it is within the jurisdiction of the United States government, which has custody and control over it, and that the act of Congress passed in 1886, granting to the city of Detroit the right to bridge it, also provided that the bridge should be devoted to such general use as may be prescribed by the municipal authorities of the city of Detroit. It is therefore argued by counsel that it was the evident intent of Congress that the bridge should be governed by the ordinances of the city, as though it was a public street, and, that its care and control is vested in the ordinance-making body, and that this power involves, of necessity, the power to appoint, govern, and control these very offices; that under the law creating this commission it is an independent body, subject to no ordinance, nor can any duty be imposed upon it by ordinance, and that its acts are not subject to review by any person or body, there being no power vested anywhere to remove any member for any cause.     Substantially, these are the claims of the parties as presented by counsel.

The learned counsel for the relators has presented with great clearness and force, in oral argument, as well as by his printed brief, the reasons for the construction of these various acts for which he contends. We cannot, however, view the case as falling within the principles for which he contends. The federal act was passed in 1886, and expressly provided that the municipal laws and ordinances of the city of Detroit may be enforced on said bridge, and that the care, control, and use of the same shall be governed by the ordinances of the city enacted as though said bridge was a public street in said city.

---

[1] Counsel for respondents cited *Park Commissioners v. Common Council*, 28 Mich. 243, 248; *Attorney General v. Common Council*, 58 Id. 226.

It was the plain intent of Congress, in granting permission to construct it, that the same should be and continue a public highway, and be known as a " post route," over which the mails, troops, and munitions of war of the United States may be transported, and the right of way for postal telegraph lines and appliances across it was reserved.   The right was also reserved to make alterations in the construction, under the direction of Congress or the Secretary of War, at the expense of the owners of the bridge.   It is not only regarded as a public highway, and under the act of Congress the care, control, and use of it to be governed by the ordinances of the city of Detroit, but it is a highway over a navigable water-way, and the bridge as a highway to be operated with reference to this water-way, and yet it is contended that the Legislature could, and did by this act of 1889, relieve the municipality from the performance of the conditions imposed by the act granting the franchise, and has conferred the absolute power and control of the bridge upon the commissioners of parks and boulevards, giving them the right and power to make all suitable and needful rules and regulations respecting the use of said bridge and its approaches, by foot-passengers, by animals and vehicles of every kind, including railway cars, engines, or motors, and to prohibit the use of such bridge by such persons, animals, cars, engines, or motors as in their judgment may be injurious to the proper use of said bridge or park, with absolute power of appointment of engineer, etc.

The charter of the city of Detroit divides the powers of local government over that municipality into two departments,—legislative and administrative.   The legislative authority is vested in the common council.   That body is not vested with administrative powers.   These are conferred upon the mayor and different agencies, such as

the board of public works, board of water commissioners, and other agencies, specified in the charter, among which is the commissioners of parks and boulevards. The common council have full control over the bridge in question, but that control must be exercised through ordinances duly enacted. When they have exercised their legislative functions, the execution or administration of their ordinances passes to the administrative agencies of the municipality. They may make all needful rules by way of ordinances duly enacted, and regulations for the use of the bridge and the approaches, and by ordinance authorize the hiring of such employés in and about such bridge as they deem expedient, and fix their compensation.

In so far as the act of the Legislature trenches upon the legislative power of the council it is ineffectual. The clause that confers upon the commissioners the authority to make all suitable and needful rules and regulations respecting the use of said bridge and its approaches by foot-passengers, etc., cannot be upheld, as it places in the hands of an administrative body legislative authority which is vested in the common council. The commissioners are the proper administrative body to have the custody and control of the bridge, under the general direction of the common council, and as such they are an agency of the municipality, as much as the board of public works, in carrying out the supervision and control of streets under ordinances of the common council. The employment of engineers and bridge-tenders is an administrative function, and not legislative.

It is to the municipality known as the city of Detroit that Congress gave its consent to erect the bridge in question. The act of Congress makes it the duty of the municipal corporation to erect the bridge and maintain it at its own expense. To perform this duty, the common council must enact ordinances to that end, and the

administrative branch of the municipality must see that they are executed. The municipal laws and ordinances enacted by the common council are to be enforced on said bridge, not by the common council as a body, but by the administrative branch of the city government, and so the care, control, and use of the bridge is to be governed by ordinances enacted by the common council as though the bridge was a public street in the city. This does not contemplate that the common council shall take upon themselves the employment of engineers and care-takers, but that they shall enact ordinances respecting the care, control, and use of the bridge, to be enforced and carried out by the administrative branch upon whom the charter has conferred the authority so to do.

We are therefore of the opinion that a peremptory writ of *mandamus,* directed to the common council of the city of Detroit, do issue, directing and commanding it to relinquish all administrative power and authority over said Belle Isle bridge and its approaches, and to set aside and vacate by appropriate action the appointment of the persons named in the petition as employés upon and about such bridge, and permit the commissioners of parks and boulevards to exercise custody and control over the same, under ordinances enacted and to be enacted by the common council for the management, preservation, and protection of said bridge and its approaches, and the use, management, and maintenance thereof, and prescribe the maximum number of employés upon said bridge, and their duties, and giving the maximum compensation which may be paid such employés; and if the common council fail or neglect to enact such ordinances, or until said council shall enact such ordinances, the commissioners of parks and boulevards may adopt such reasonable rules and regulations as said council may approve in and about the use of said bridge and its approaches.

And the said August Lemmer, Frank Blaimaister, Charles Forbes, John Tracy, Baltis Martin, Michael Kilcline, William Halloran, Stephen Murphy, Joseph Deidrich, Angelis Verlinden, Fred Erhard, Jerry Monyhan, and Frank Kelos are hereby directed and commanded to surrender to said commissioners of parks and boulevards the actual custody and possession of said bridge and its approaches; and it is declared that such persons last above named are subject to the supervision and control and employment of said commissioners of parks and boulevards, as the administrative agency of said municipality in enforcing the ordinances enacted by said common council in and about the care, custody, and control of said bridge and its approaches. No costs are to be awarded to either party.

CHAMPLIN, C. J., GRANT and CAHILL, JJ., concurred with LONG, J.

MORSE, J., (*dissenting*). It is very clear to me that the writ of *mandamus* ought to be denied in this case. It is plain, from the opinion of the majority of the Court, that the main intent of the Legislature in making this bridge a part of Belle Isle park is nullified because of its contravention not only of the conditions imposed by the federal government in the act of Congress giving assent to the building of the bridge, but also because of its encroachment upon the legislative power and authority of the municipality of the city of Detroit, which power, under our system of government, must be exercised through and by its common council. When the administrative power only is left valid in the legislative act, the act is not only shorn of its strength and emasculated, but it becomes really a new act, and one created by this Court, and not by the Legislature. It is plain

as day that the Legislature, by section 11 (Act No. 388, Local, 1889), undertook and intended to give exclusive control of this bridge to the park and boulevard commissioners. It is provided that—

" Said commissioners shall have the custody and control [of said bridge], subject to the general directions of the common council. Said commissioners *may make all suitable and needful rules and regulations* respecting the use of said bridge and its approaches by foot-passengers, by animals and vehicles of every kind, including railway cars, engines, or motors, and may *prohibit* the use of such bridge by such persons, animals, cars, engines, or motors, *as in their judgment* may be injurious to the proper use of said bridge or park. They may appoint the necessary engineers or bridge-tenders, and *provide for the payment of their compensation.*"

The commissioners evidently understand the grant of power intended by the Legislature in this section, and they come into this Court asking that the *absolute* control, care, and custody of this bridge be at once surrendered into their hands. The clause in section 11, which provides that the custody and control shall "be subject to the general direction of the common council," amounts to nothing. When the whole section is taken into view, and its provisions construed together, as it must be, what is there left for the council to direct? Nothing at all. Every power connected with the bridge or its use is placed in the commissioners. They are to make the rules and regulations governing its use and control, and no person, animal, or vehicle can pass over it without their consent, or in any other way than they may direct. There is the appointment and discharge of all the care-takers and employes about the bridge, and the fixing of the number of such employes and their compensation. It is no longer a highway, but a park. But, in view of the federal statute, this bridge must be

considered a highway, and be governed as other highways and streets are governed and controlled by the city of Detroit.  My brethren, in effect, concede this.

If the legislative act is to be construed as invalid when it undertakes to confer legislative power upon the commissioners, and such commissioners have only administrative functions to perform as regards this bridge, what is there left of this section 11 ?  What power can the commissioners exercise under the construction put upon it by this Court ?  They become a mere agency of the city, and as such agent can name the employes, and see to it that the rules and regulations enacted by the common council are enforced.  The bridge is to be considered a public street, and not a park or boulevard.  And the inconsistency of this construction of the statute is seen when we look at section 6 of the act, creating these commissioners, which provides that they shall have no control over ordinary streets or alleys.  Local Acts of 1889, § 6, p. 609.  Their control extends only over parks and boulevards, and, if this bridge is to be treated as a public highway, the commissioners have no business with it.  And over parks and boulevards they are given absolute control, and the common council cannot interfere with them if the act is valid which I doubt.  Id. § 2, pp. 607, 608.  The Legislature, in making this bridge a part of Belle Isle park, evidently intended to give the commissioners the same power and control over this bridge as they did of the parks and boulevards.  But, under the construction of this Court, the commissioners cannot even fix the number of employes on the bridge, or the compensation to be paid them.  Instead of being masters of the bridge as a park, as enacted and intended by the Legislature, they are made the servants of the common council, with only one poor privilege, to wit, the naming of the persons who shall wait on the bridge.

This holding is not only inconsistent and at variance with the act of the Legislature, but against that public policy, which makes it desirable always that the employe shall be selected by the employer. The commissioners can now make no suitable "or needful rules and regulations," nor can they prohibit any person, animal, or vehicle passing over the bridge, nor can they provide for the payment of the engineers and bridge-tenders. So much of section 11 is declared invalid by this Court that there is nothing left of it that can stand under any rule. It is not to be supposed for one moment that the Legislature would have passed this section 11 if it had contained only the provision that the commissioners might appoint the engineers and bridge-tenders, yet that is all that is now left them, except that they may have some policemen detailed to see that the rules and regulations of the common council are enforced.

I fully agree with my brethren as to the effect of the federal act of assent to the building of this bridge, and that the Legislature, in view of it, cannot confer any legislative power over this bridge; but I am further satisfied that the Legislature can neither make it a park nor boulevard, nor give the commissioners any right to interfere in any manner with it, except in so far as the common council of the city of Detroit may permit such interference. And as the city of Detroit, through its proper agencies, must keep this bridge in good repair, and in a reasonably safe condition for public travel, and be responsible under the laws of this State for all damages occurring through a neglect of its duty in this respect, it seems to me better policy that the employes upon this bridge should be appointed and discharged by the common council, a body much nearer the people than a board which is not directly responsible to them, or easily reached by the people, if they go wrong.