BLADES *v.* BOARD OF WATER COMMISSIONERS OF DETROIT.

1. MUNICIPAL CORPORATIONS—WATERWORKS—SYSTEM OF SUPPORT —CHANGE BY STATUTE—INSUFFICIENT TITLE.

Act No. 408, Local Acts 1899, entitled "An act to transfer to the city of Detroit the title to all the property, of every name and nature, now owned, operated, and controlled by the board of water commissioners of the city of Detroit under [an act of 1853 and amendments], and to give to said city of Detroit the possession, control, and operation and management of said property," and embracing provisions for the supplanting of the existing system of waterworks, supported by a levy of water-rates upon all consumers, by a system involving free water to the municipality and for domestic consumption, to be provided for by a general tax levy, is in contravention of article 4, § 20, of the Constitution, providing that no law shall embrace more than one object, which shall be expressed in its title.

2. SAME — COMPULSORY TAXATION FOR LOCAL PURPOSES — ILLEGALITY.

The provisions of section 9 of Act No. 408, Local Acts 1899, which constitute the mayor and certain other officers of the city of Detroit a board for the purpose of estimating annually, and reporting to the common council, the amount of money which they deem a just proportion of the total amount required for the support of the waterworks, as previously determined by the council and board of estimates, for the expense of furnishing water for domestic and other specified uses, and which provide for the levy and assessment of the proportionate amount so reported upon the taxable property of the city, without submission to the board of estimates or to a vote of the freemen, are unconstitutional and void, as imposing taxation for a purely local purpose without the consent of the electors or their chosen representatives.

3. SAME—WATER BENEFITS—FRONTAGE.

The provision of section 6 which contemplates an assessment against the individual lot-owner of his proportionate share of the cost of laying water-pipe in the block in which his lot is situated, such proportion to be ascertained "by finding the ratio which the narrowest frontage of said lot bears

to the entire frontage on both sides of the street or alley in the block," is also illegal.

4. SAME—CONSTRUCTION OF STATUTES.

The unconstitutional scheme of taxation provided for in sections 6 and 9 of Act No. 408, Local Acts 1899, is so interwoven with the entire frame of the act, that the whole act must fall.

*Certiorari* to Wayne; Carpenter, Lillibridge, Hosmer, and Waite, JJ. Submitted October 24, 1899. Decided December 21, 1899.

*Mandamus* by Francis A. Blades, comptroller of the city of Detroit, to compel the board of water commissioners of said city to turn over to him the books, papers, and property of the waterworks system, in accordance with the provisions of Act No. 408, Local Acts 1899. From an order denying the writ, relator brings *certiorari.* Affirmed.

In 1853 the legislature passed an act (Act No. 90, Laws 1853) entitled " An act to amend the laws relative to supplying the city of Detroit with pure and wholesome water," which act was approved February 14, 1853. Under this act the present board of water commissioners of the city of Detroit was organized, and it has ever since conducted its affairs under that act and acts amendatory thereof. The material provisions of that act are as follows:

"SECTION 1. *The People of the State of Michigan enact,* That Shubael Conant, Henry Ledyard, Edmund A. Brush, William R. Noyes, and James A. Van Dyke be and they are hereby named and constituted as a 'board of water commissioners of the city of Detroit,' who, and their successors in office, shall be known by the name and style of the 'Board of Water Commissioners of the City of Detroit,' and by that name shall have power to contract, sue, and be sued, to purchase, hold, and convey personal and real estate, to have a common seal, to alter and change the same at pleasure, to make by-laws and ordinances, and do all legal acts which may be necessary and proper to carry out the effect, intent, and object of this act.

"SEC. 2. The said commissioners shall hold their offices

respectively for the term of three, four, five, six, and seven years from the first Tuesday in May of the year one thousand eight hundred and fifty-three. Said commissioners shall, within sixty days after the passage of this act, decide by lot their respective terms, which decision shall be notified by a written statement to the common council of said city, which shall be entered of record on the books of the said common council; and at their first regular meeting in the month of April in the year one thousand eight hundred and fifty-six, and annually thereafter, the said common council shall elect and appoint a citizen of said city, being a qualified voter and a freeholder, as a commissioner, who shall hold his office for five years from the first Tuesday in the May next following: *Provided*, that this section shall not be so construed as to disqualify any member of the said board for reappointment; and in case of the death, or resignation, or removal from the city of any of said commissioners, the common council shall, as soon thereafter as possible, appoint to fill such vacancy, for the remainder of the term, some citizen of said city, being a qualified voter and freeholder."

"SEC. 4. The said commissioners shall have power to loan from time to time, upon the best terms they can make, after giving public notice by advertising in the city papers for sixty days, and in one paper in Boston, and two in New York, for such time as they shall deem expedient, a sum of money, not exceeding two hundred and fifty thousand dollars, upon the credit of said city of Detroit, and shall have authority to issue bonds pledging the faith and credit of said city for the payment of the principal and interest of said bonds; which bonds shall issue under the seal of said board of commissioners, and shall be signed by them, or a majority of them, and bearing interest not exceeding eight per cent. per annum. And it shall be the duty of said commissioners to cause to be kept an accurate register of all the bonds issued by them, showing the number, date, and amount of each bond, and to whom the same was issued; and it shall also be their duty to cause to be furnished to the auditor of said city a copy of such register as soon as the same is made, which shall be preserved by said auditor, and copied into the records of said city.

"SEC. 5. It shall be the duty of said commissioners to examine and consider all matters relative to supplying the

city of Detroit with a sufficient quantity of pure and wholesome water, to be taken from the Detroit river, or such other source as may be deemed expedient, for the use of its inhabitants.

"SEC. 6. Said commissioners shall have power to employ superintendents, clerks, collectors, assessors, engineers, surveyors, and such other persons as, in their opinion, may be necessary to enable them to perform their duties under this act, and to specify the duties of such persons so employed, and to fix their compensation: *Provided,* that in no case shall said commissioners receive, directly or indirectly, any compensation for their own services.

"SEC. 7. Said commissioners shall have power, and it is hereby made their duty, as soon as may be after the necessary funds have been procured as herein provided, to purchase such land and materials, and to construct such reservoirs, buildings, machinery, and fixtures, as shall be deemed necessary or desirable to furnish a full supply of water for public and private use in said city.

"SEC. 8. Said commissioners shall have power to construct reservoirs, jets, and fire hydrants at such localities in said city as they may deem expedient and necessary, and to lay pipes in and through all the alleys and streets of said city; and also to construct in such localities as they may deem expedient, not exceeding one to each block, hydrants for public use, and to keep the same in repair; and also, with the consent of the common council of said city, to construct fountains in the public squares, or such other public grounds of said city as they shall deem expedient.

"SEC. 9. Said commissioners shall, from time to time, cause to be assessed the water-rate to be paid by the owner or occupant of each house or other building having or using water, upon such basis as they shall deem equitable; and such water-rate shall become a continuing lien, until paid, upon such house or other building, and upon the lot or lots upon which such house or other building is situated."

"SEC. 13. Whenever the receipts of said board, from water-rates or other sources, shall accumulate so that there shall be a surplus, amounting to a sum of not less than five hundred dollars, not needed for the payment of the current expenses or the extension of said works, it shall be the duty of the commissioners, together with the auditor of said city, who shall be associated with them for that

purpose, to invest the same in some safe stocks, or upon other real or personal securities. Such investment shall be made in the name of said board, and in such manner as to make the same available for the payment of interest and principal of the bonds issued as aforesaid as soon as may be. It shall be the duty of said commissioners to pay the interest on such bonds, and, as fast as such surplus fund will permit, also the principal, as the bonds become due, as funds for such purpose shall from time to time accumulate. The said commissioners may, when they have funds for that purpose, purchase the bonds so issued as aforesaid, whether the same have become due or not; and in case the said commissioners shall at any time not have funds on hand sufficient to meet any of the said bonds at the time when they shall become due, they shall have the right to issue new bonds, for such amount and on such time as they shall deem expedient, in the place of bonds so becoming due as aforesaid; the said old bonds to be canceled in the registry thereof, and the said new bonds to be recorded in the manner hereinbefore provided."

"SEC. 24. It shall be the duty of said commissioners, at least thirty days before the time fixed by the ordinance of said city for assessing city taxes, to make a special report to the common council of said city, what, if any, sum will be needed by said commissioners, over and above the revenue of said board, to meet the payment of interest or principal of the bonds issued as aforesaid; and it shall be the duty of the common council to raise said amount by special tax in the same manner as general taxes, to be designated a water tax; and the said amount shall be paid over to said board by the treasurer of said city."

"SEC. 26. All lands, lots, docks, buildings, machinery, pipes, logs, hydrants, and all fixtures whatsoever, purchased, designated, or used for the present waterworks of the said city of Detroit, are hereby conveyed to and vested in said board of commissioners, who shall have full power to regulate, protect, and control the same; and all the authority, rights, and power heretofore exercised and had by said city over said works are hereby continued to and vested in said board of commissioners."

By subsequent acts of the legislature, the respondent was authorized to issue bonds for the purpose of extending and improving the waterworks. In 1873 a loan of a million dollars was authorized. Section 2 of that act (Act No. 302, 3 Laws 1873) is as follows:

"If the said commissioners shall, at any time, not have funds on hand sufficient to meet any of the said bonds at the time when they shall become due, they shall have the right to issue new bonds, for such amount and on such time as they shall deem expedient, in the place of the bonds so becoming due as aforesaid, or such part thereof as said commissioners shall be unable then to pay. The said old bonds so taken up shall be canceled, and such cancellation recorded or otherwise indicated in the registry thereof, and the said new bonds shall be recorded in the manner hereinbefore provided. It shall be the duty of the common council, and said council is hereby empowered, to cause to be levied and assessed annually, upon the taxable property in said city, the sum of seventy-five thousand dollars, the same to be included in each annual tax assessment levied on said city, and the same shall not require or be conditioned upon the vote of the freemen of said city. The said sum shall be collected the same as other general taxes, and shall, from time to time, as received, be paid over to said board by the treasurer of said city; and the moneys so paid over by said treasurer to said board shall be used and appropriated by said board, *first*, in payment of the interest of said bonds; *second*, if there be any surplus after payment of the interest accruing during the year, said moneys shall be paid into and form a part of the sinking fund of said board, and used and appropriated to the payment of said bonds when due, or to the purchase of the same, or of any other of the bonds heretofore issued by said board, as the said board may, from time to time, think expedient."

The purpose of this loan was the removal of the waterworks outside the territorial limits of the city of Detroit. In 1887 an act (Act No. 539, Local Acts 1887) was passed which, among other things, authorized the respondent to accept a bequest made to it by Chauncey Hurlbut, who had been for many years the president of the board.

The value of the property under the control of the commissioners January 1, 1899, was $6,030,963.29. Up to 1875 it had been supported by water-rates alone. From that year to the present a general per annum tax has been levied, under the direction of the common council, under the section last above quoted, amounting to from about $18,000 to about $74,000.

In 1899 the legislature passed an act (Act No. 408, Local Acts 1899) entitled:

"An act to transfer to the city of Detroit the title to all the property, of every name and nature, now owned, operated, and controlled by the board of water commissioners of the city of Detroit, under the powers, rights, and privileges granted said board of water commissioners by an act entitled 'An act to amend the laws relative to supplying the city of Detroit with pure and wholesome water,' approved February fourteenth, eighteen hundred fifty-three, and the acts amendatory thereto, and to give to said city of Detroit the possession, control, and operation and management of said property, and to repeal all acts and parts of acts in conflict herewith."

Section 1 provides for the transfer of all the property, authority, rights, and powers of the board of water commissioners to the city of Detroit, and provides that the operation, extension, and improvement of the system shall be under the direction and supervision of the board of public works.

Section 2 provides for the laying of pipes, mains, etc., in the streets and through private property; defining the proceedings to be instituted for condemnation.

Section 3 provides for the purchase of lands, and the erection of buildings and machinery.

Section 4 provides for the assumption by the city of Detroit of the bonded and other indebtedness of the board of water commissioners, and also of all lawful contracts entered into by said board of commissioners, and for the prosecution of all suits then pending.

Section 5 provides for the erection of drinking hydrants for public use.

Section 6 provides for the erection of a separate department of the board of public works, to be known as the "Water Department" thereof, and for the employment of superintendent, clerks, etc.; for the removal of the superintendent; for the classification of the work of the department, and the keeping of accounts. It also contains the following provisions:

"It shall keep a separate account of the cost of laying distributing pipes, aqueducts, and mains hereafter laid, so that the cost thereof in each block may be ascertained at any time, and so that, whenever a pipe or main larger than six inches in diameter is laid, the cost of laying the six-inch pipe in each block, had it been laid, may also be ascertained. The just proportion of the cost of laying said six-inch pipes shall be assessed to each lot benefited. Such just proportion shall be ascertained by finding the ratio which the narrowest frontage of said lot bears to the entire frontage on both sides of the street or alley in the block where said lot is located. The amount of such just proportion due from each lot, when ascertained, shall be assessed as a special assessment upon such lot. The common council shall provide by ordinance for the collection of all such special assessments. Lots already supplied with water shall not be subject to special assessment for water-pipes hereafter laid. No lot shall be supplied with water from any pipe, main, or aqueduct hereafter laid, without there is first paid to the city treasurer the just proportion of the cost of laying a six-inch pipe in the street or alley on which said lot abuts, with interest thereon from the time said pipe is laid. Such money, when paid, shall be credited to the water department construction fund."

Section 7 provides for the distribution of water outside the city.

Section 8 provides for a division of the revenues and moneys of the water department of the board of public works into separate funds.

Sections 9 and 10 are as follows:

"SEC. 9. It shall be the duty of the board of public works to transmit to the common council of the city of Detroit, on or before the fifteenth day of February in each year, an estimate of the amount of moneys which said board may deem necessary for improving and enlarging the pumping works and plant of the waterworks of the city of Detroit; also an estimate of the amount of money said board may deem necessary to pay the cost of extending water mains and pipes, and for any other purpose essential to the proper maintenance and operation of the waterworks and water system of said city. Such estimates, or so much thereof as the common council shall approve, shall be submitted to the approval of the board

of estimates, at the meeting thereof required by law for
the approval of annual taxes voted by said common coun-
cil; and so much of said estimates as shall be approved by
the board of estimates shall be placed upon the general
assessment rolls, and shall be assessed, levied, and collected
the same as other city taxes.  Said money, when collected,
shall be paid into the city treasury, and shall be credited to
the construction fund of the water department.  They
shall also transmit to the common council, on or before
the fifteenth day of February of each year, an estimate of
the total amount of money they deem necessary to pay
the cost of maintaining and operating the water plant for
the ensuing fiscal year, which shall include all necessary
repairs.  Such estimate, or so much thereof as the common
council and board of estimates shall approve, shall be
levied and collected as hereafter provided.

"The board for fixing water-rates, as provided for in
section ten of this act, shall prepare and transmit to the
common council, on or before the first day of May in each
year, an estimate of the amount of money they deem a
just proportion of the total estimate for maintenance as a
reasonable charge for the expense of furnishing water for
domestic purposes to the inhabitants of the city of Detroit,
such domestic purposes to include such use of water in
and about places of residence as are usual for household
purposes; and for water used for water-closets and wash-
room facilities in all buildings used wholly or in part for
other than residence or household purposes; to the city of
Detroit, including its agencies and municipal boards, the
Detroit house of correction, the public schools, and such
charities as the common council shall have determined to
exempt from the payment of water-rates,—which estimate
shall be in detail, specifying the objects of such expendi-
ture, the sums desired for each, and the reasons therefor.
It shall be the duty of the common council to cause to be
levied and assessed, upon the taxable property of the city,
the sum so stipulated, as contemplated in the preceding
paragraph, and the same shall not be submitted to the
board of estimates or to a vote of the freemen of the city.
When such tax is collected, it shall be paid into the city
treasury, and credited to the water department mainte-
nance fund.  The balance of the total estimate for operat-
ing expense shall be assessed as water-rate, to be paid by
the owner or occupant of each house or other building
having or using water, and against any persons using

water, except for domestic purposes, in the city of Detroit, upon such basis as they shall deem equitable; and such water-rate shall become a continuing lien, until paid, upon such house or other building, and upon the lot or lots upon which the house or other building is situated; and all such water-rates, when collected, shall be paid into the city treasury, and credited to the water department maintenance fund.

"Any surplus of moneys remaining in the maintenance fund at the end of any fiscal year shall be applied to and credited to the maintenance fund of the ensuing fiscal year, and shall be used for no other purpose. Any surplus of money remaining in the construction fund at the end of any fiscal year shall be applied to and credited to the construction fund of the ensuing fiscal year, and shall be used for no other purpose. On and after the first day of July, eighteen hundred ninety-nine, the water-rates, as heretofore levied and collected by the water commissioners, shall continue to be levied and collected under the supervision of the board of public works, until the first day of July, nineteen hundred, when said rates shall cease, and thereafter the water-rates shall be assessed and collected as provided for in this act.

"SEC. 10. The superintendent of the water department, the mayor, the president of the board of public works, the city comptroller, and the city treasurer shall constitute a board for fixing water-rates, which shall, on or before the first day of May of each year, fix a schedule of the water-rates to be collected for the ensuing fiscal year, which schedule shall comply with the requirements of the preceding section. The water-rates so fixed shall be collected by the receiver of taxes in such manner and at such times as shall be provided by an ordinance by the common council."

Section 11 provides for an annual report by the city comptroller of the financial condition of the water department, and provides for access to the books for that purpose.

Section 12 provides for a distribution of the revenue received from the house of correction, and that all the bonds mentioned and provided for in this act shall continue to be exempt from the charter provision limiting the bonded indebtedness of the city.

Section 13 provides a penalty for injuring any of the property of the waterworks.

The act contains no repealing clause.

The respondent refused to turn over to the relator the books, property, etc., under its control. Thereupon he applied to the circuit court for the county of Wayne for a writ of *mandamus* to compel such delivery. The case was there heard before four of the circuit judges, three of whom (Judges Carpenter, Lillibridge, and Hosmer) held the law to be void. The majority opinion held that the scheme of taxation provided in section 9 of the act is unconstitutional, because, in a matter purely local, the power of taxation was conferred upon a board appointed by the legislature, in which the taxpayers and freemen of the city were allowed no voice, either by direct vote or by those chosen to represent them for that purpose, and that this unconstitutional scheme was so interwoven with the entire frame of the act that the entire act must fall. In a concurring opinion filed by Judge Hosmer, he held that the object of the law was not expressed in its title, and that the act was, for this reason, void. Judge Waite dissented, and, while he held that certain provisions were unconstitutional, he also held that the waterworks might be carried on and maintained as heretofore, and that the balance of the act could stand, without the unconstitutional provisions.

*Charles Flowers* and *Charles D. Joslyn* (*John J. Speed*, of counsel), for relator.

*Fred A. Baker* (*Henry M. Duffield*, of counsel), for respondent.

GRANT, C. J. (*after stating the facts*). The validity of the act of 1899 presents the sole question involved in this proceeding. Its validity is attacked upon numerous grounds. The only ones necessary to discuss and determine are involved in the following questions: (1) Is the object of the act expressed in its title, within section 20, art. 4, of the Constitution, that "no law shall embrace more than one object, which shall

be expressed in its title?" (2) Is the scheme of taxation provided by the act valid? (3) If not valid, can the act stand with this provision stricken out?

1. The present board of water commissioners holds, and has possession of, this property as a trustee for the city. The city is the owner, just as effectually as though the deeds were made direct to it. Under the new act, the property is no more and no less the property of the city than it was under the old act. The legislature so understood; for section 1 declares the title to be conveyed to, and vested in, the city by virtue of the act. No deeds of conveyance or evidences of transfer from the board of water commissioners are required. The operation, extension, and improvement of the system, as provided in the act, are intrusted to the direction and supervison of the board of public works of said city, which is directed to have a separate department, to be known as the "Water Department of the Board of Public Works," with power to employ superintendent, clerks, etc., and to specify their duties, their compensation to be fixed by the common council. The administrative control and management is transferred from the water board to the board of public works, the principal difference between the authority of the former board and the latter being that the latter is more under the control of the common council than the former; in other words, the board of water commissioners can do certain acts without the consent of the common council, whereas the board of public works cannot do them without such consent. We are not prepared to hold that, looking into the body of the act, its sole object is to transfer the control and management of the waterworks to the board of public works. It is unnecessary to decide this question.

It is pertinent here to determine what the object of the act is, as expressed in the title. It was not to transfer the title to the property to the city, for that the city already had. It was evidently to transfer and give to the city the "possession, control, and operation and management,"

which had theretofore been exercised by the board of
water commissioners. Does the title purport to contem-
plate a complete revision of the system by which the
waterworks had been supported for nearly half a century,
and the transfer of its management under rules and regu-
lations radically different from those which had thereto-
fore existed? If this were an original act to authorize the
city to establish a water department, and to provide for
the control, operation, and management thereof, such
title would undoubtedly be sufficient, as is clearly shown
in *People* v. *Mahaney*, 13 Mich. 495, and *People* v.
*Hurlbut*, 24 Mich. 44 ( 9 Am. Rep. 103 ). We have given
the two acts almost in full, so that the difference may be
readily seen. The purpose of this constitutional provision
is that legislators, and as well parties interested, may
understand from the title that only provisions germane to
the object therein expressed will be enacted. Would the
title to this bill, as introduced in the legislature, when read
by a taxpayer of Detroit, be notice to him that the system
of supporting the waterworks was to be changed from
that of water-rates to that of taxation? Would it be
notice to the manufacturers and the business men of
Detroit that they were to pay water-rates, while all the
rest—a great majority—of the city were exempt, and
were to have free water, and that they were to be taxed to
furnish free water to their neighbors? Clearly, no such
object can be found in the title, which simply authorizes
the transfer from one department of the city government
to another, and gives to the transferee the possession, con-
trol, operation, and management thereof. Obviously, it
would not naturally be inferred that the legislature, under
such a title, intended to make the radical changes pro-
vided for in the body of this act. What is there to
indicate an intention to virtually abolish the water-rate
system, and substitute taxation in its stead? or to pro-
vide free water to the inhabitants of the city? or to give
water to private individuals, and charge its cost to the
taxpayers? As is well stated by Judge Hosmer in his

opinion, there is "no natural connection between the title of the act and the extraordinary provisions for raising the means necessary to defray the incidental expenses." What we said in *Grosvenor* v. *Duffy*, 121 Mich. 220, is equally applicable here.   See, also, *Ryerson* v. *Utley*, 16 Mich. 269.   The fair inference to be drawn from this title is that the object is to take away the possession of the waterworks, and its control and management, from the board of water commissioners, and transfer them to the city, and that the body of the act would contain only such provisions as were essential to accomplish that object.

2. The method provided by this act for the support and maintenance of the waterworks is unconstitutional and void.   While the provisions of the act are somewhat incongruous, it is apparent that it imposes compulsory taxation for purely local purposes.   The board established by section 10, to fix water-rates, is also, by section 9, directed to prepare and transmit to the common council an estimate of the amount they deem a just proportion of the total estimate for maintenance as a reasonable charge for furnishing water for domestic and other purposes therein specified.   It is then made the duty of the common council to levy and assess upon the taxable property of the city the sum so fixed, and that it shall not be submitted to the board of estimates or to a vote of the freemen of the city.   The furnishing of water to the city and its inhabitants is a purely local matter, and it is not within the power of the legislature to compel taxation for that purpose, without the action of the freemen of the city or their chosen representatives.   This question was fully and ably discussed in *People* v. *Common Council of Detroit*, 28 Mich. 228 (15 Am. Rep. 202), which is the leading case in this State upon the subject.   In an exhaustive opinion by Justice COOLEY, where the attempt was made by the legislature to impose compulsory taxation for the maintenance of a park, he closes his discussion with the following pertinent language:

"No precedent entitled to respect can justify such a change of powers; for, from the very dawn of our liberties, the principle most unquestionable of all has been this: That the people shall vote the taxes they are to pay, or be permitted to choose representatives for the purpose."

In a concurring opinion, Justice CAMPBELL said:

"From time immemorial, every municipal government, properly so-called, and acting within its peculiar sphere, has acted through its common council, composed either of the burgesses or their representatives, subject in some cases to checks and vetoes, but not subject to legislation or final action in defiance of their own decisions.    Their supremacy cannot be given up by themselves any more than it can be taken from them.    No doubt the State can limit their powers, but it cannot transfer them."

The question is there so thoroughly discussed that we deem it unnecessary to further consider the question. See, also, *Commissioners of Parks & Boulevards of Detroit* v. *Common Council of Detroit*, 80 Mich. 663.

The judges below all agree that the provision contained in section 6 for assessing the cost of laying a six-inch pipe in front of each lot is void, and in this opinion we concur.

3. The body of this act provides a complete revision and change in the system of maintaining and conducting the waterworks.    The leading feature in it is the change from maintaining it by water-rates to that of taxation and free water.    Nearly all its provisions are in conflict with the act of 1853.    The leading feature in the body of the act is not the transfer from one department to another, but the complete change in the system.    It cannot be said that the legislature intended simply to transfer the property, control, and management, and not to impose upon the new body the provisions incorporated for such management and the method for raising the necessary funds to sustain and carry it on.    This would require the courts to say that the legislature intended to retain the old system if the new one could not prevail.    This would amount to judicial legislation, and compel us to legislate into the act

that which it does not contain. With these provisions eliminated, resort must be had to the old system of water-rates, which it was the clear intention of this act to substantially eliminate. The unconstitutionality of these provisions renders the whole act void. See *Quinlon* v. *Rogers*, 12 Mich. 168; *Campau* v. *City of Detroit*, 14 Mich. 276; *Warren* v. *Mayor, etc., of Charlestown*, 2 Gray, 99; *Jones* v. *Robbins*, 8 Gray, 339; *Slauson* v. *City of Racine*, 13 Wis. 398.

The judgment is affirmed.

. The other Justices concurred.