WAYNE COUNTY BOARD OF COMMISSIONERS v WAYNE COUNTY
AIRPORT AUTHORITY

Docket No. 241521, 242406. Submitted September 18, 2002, at Detroit.
Decided September 24, 2002, at 9:10 A.M.

The Wayne County Board of Commissioners and others brought an
action in the Court of Appeals against the Wayne County Airport
Authority, the Wayne County Treasurer, and others, seeking declar-
atory and injunctive relief against the transfer of operational juris-
diction over Detroit Metropolitan Airport and Willow Run Airport
from Wayne County to the airport authority pursuant to 2002 PA 90,
MCL 259.108 to 259.125c. The Wayne County Treasurer filed a
cross-claim against the airport authority, seeking, in part, declara-
tory relief regarding the procedures for the transfer of money and
assets pursuant to 2002 PA 90. The Court of Appeals consolidated
the claims and directed the parties to file cross-motions for sum-
mary disposition.

The Court of Appeals *held*:

The plaintiffs' claimed Headlee Amendment violation regarding
the requirement of 2002 PA 90 that the county continue to employ
airport employees who choose not to transfer to the airport author-
ity is not ripe for adjudication and is therefore dismissed without
prejudice. Summary disposition is granted in favor of the defen-
dants with respect to the plaintiffs' other claims.

1. The transfer of operational jurisdiction over the airports at
issue from the county to the airport authority does not impair the
county's obligations to bondholders and therefore does not violate
Const 1963, art 1, § 10 or US Const, art I, § 10, which prohibit the
enactment of law impairing obligations of contract, because airport
revenues and bond obligations are assumed by the airport authority
upon the transfer of operational jurisdiction. 2002 PA 90, subsec-
tions 117(1)(c), 118(2).

2. Subsection 119(3) of 2002 PA 90, which requires the county to
contribute to the pensions of airport authority employees until the
airport authority forms its own pension plan, is not an unfunded
mandate that is prohibited by the Headlee Amendment, Const 1963,
art 9, § 29. Under 2002 PA 90, subsection 117(1)(d), the airport
authority assumes unfunded obligations relative to pensions.

3. Subsection 118(3)(c) of 2002 PA 90 does not violate the Headlee Amendment in requiring the county to assume the costs of airport title insurance, legal fees, and acquisition costs. These costs have been the responsibility of the county as owner of Metro Airport and thus are not new mandates for purposes of the Headlee Amendment.

4. The plaintiffs provided no explanation or demonstration of how subsection 111(9) of 2002 PA 90, which requires the treasurer of any local government receiving or having custody of money or other property belonging to an airport authority to promptly transfer the money and property to the custody of the chief financial officer of the authority, results in an unfunded activity that violates the Headlee Amendment.

5. The transfer of operational jurisdiction over the airports at issue from the county to the airport authority will not cause the county to default on contractual obligations and therefore does not result in a violation of the constitutional clause regarding impairment of contracts. Subsection 117(1)(c) of 2002 PA 90 provides that the transfer of the operational jurisdiction over an airport to an authority may not in any way impair any contracts with airlines, vendors, tenants, bondholders, or other parties in privity with the local government that owns the airport.

6. There is no merit to the plaintiffs' claim that the county will not be reimbursed for transitional services provided by the county to the authority. Subsection 118(4) of 2002 PA 90 requires the authority to pay the reasonable cost of such services.

7. There is no merit to the plaintiffs' claim that several provisions of 2002 PA 90 that direct county officials to take certain actions upon penalty of criminal and civil prosecution constitute prior restraint on political speech. The plaintiffs' challenge to subsection 110(2) of 2002 PA 90—which requires officials and employees of the county and the airport authority to actively cooperate with the county, the airport authority, the state, and the federal government toward approval by the Federal Aviation Administration (FAA) of the transfer of operational jurisdiction over the airports at issue—has been made moot by FAA approval of the transfer. The requirements of section 117 and subsection 118(3) of 2002 PA 90 do not implicate the plaintiffs' free speech rights under the First Amendment.

8. There is no merit to the plaintiffs' claim that the Legislature lacked the authority to create the airport authority. Const 1963, art 7, § 27 provides: "Notwithstanding any other provision of this constitution the legislature may establish in metropolitan areas addi-

tional forms of government or authorities with powers, duties and jurisdictions as the legislature shall provide."

9. Contrary to the plaintiffs' assertion, the airport authority is a unit of the county, not the state. Subsection 110(1) of 2002 PA 90 plainly and unambiguously provides that an airport authority created under or pursuant to the act shall be a political subdivision and instrumentality of the local government that owns the airport.

10. Article 7, § 16 of the Michigan Constitution empowers the Legislature to regulate the powers and duties of counties in relation to highways and airports. 2002 PA 90, in providing for control by the airport authority over airport roads and facilities, does not violate Const 1963, art 9, § 29, which provides, in part, that except as otherwise provided in the constitution, the right of counties to the reasonable control of their highways, streets, alleys, and public places is reserved to the counties.

11. 2002 PA 90 does not violate Const 1963, art 9, § 18, which provides that "[t]he credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution." With respect to revenue bonds, the obligation followed the transfer of the revenues and no lending of credit occurred. The state, in enacting 2002 PA 90, did not create an obligation legally enforceable against the county for the benefit of the airport authority. With regard to airport hotel bonds, which were secured by the county's pledge of full faith and credit and which obligation was not assumed by the airport authority, the plaintiffs conceded that in the initial transaction they received money for the full faith and credit pledge. Given that fact, the initial transaction did not constitute a lending of credit.

12. The airports at issue were held by the county in a public, not a private, capacity and thus were not private property that was taken for public use without just compensation within the meaning of Const 1963, art 10, § 2.

13. 2002 PA 90 does not violate the Title-Object Clause of the state constitution, Const 1963, art 4, § 24. 2002 PA 90 does not implicitly amend the Revenue Bond Act, MCL 141.101 et seq., and therefore does not exceed the scope of its title, which makes no mention of such an amendment. The body of 2002 PA 90 does not embrace more than one object and therefore the act does not violate the multiple object prohibition of the Title-Object Clause. 2002 PA 90, which was added to the Michigan Aeronautics Code, MCL 259.1 et seq., did not change the original purpose of the code and therefore does not violate the "change of purpose" prohibition of the Title-Object Clause. 2002 PA 90 does not violate the Title-Object Clause on the basis that it applies only to Wayne County and the

county was not named in the title of the act. The application of 2002 PA 90 is based on the number of enplanements. Although Metro Airport is the only airport that meets the enplanement criterion currently, other airports may in the future meet the criterion.

14. 2002 PA 90 is a general act, not a local or special act that had to be approved by a majority of voters in the county as required by Const 1963, art 4, § 29. 2002 PA 90 is not constitutionally unsound on the basis of the absence of such voter approval.

15. 2002 PA 90 is not preempted by the Federal Aviation Act, 49 USC 47101 to 47153. 2002 PA 90 does not conflict with the Federal Aviation Act with respect to assurances given by Wayne County to the Federal Aviation Administration relative to federal airport grants. Despite the transfer of operational jurisdiction over the airports at issue, the county reserved sufficient rights and authority to ensure that the airports will be operated and maintained in accordance with federal requirements.

16. The cross-claim need not be addressed given the resolution of the plaintiffs' claims.

Dismissed.

1. CONSTITUTIONAL LAW — IMPAIRMENT OF CONTRACTS.

The test for unconstitutional impairment of contracts by a state law weighs the extent of the impairment on the rights and obligations of the contracting parties against the state's police powers to regulate in the public interest (US Const, art I, § 10; Const 1963, art 1, § 10).

2. CONSTITUTIONAL LAW — HEADLEE AMENDMENT — PROHIBITION OF UNFUNDED MANDATES.

The Prohibition-of-Unfunded-Mandates Clause of the Headlee Amendment requires the state to fund any new activity or service required by state law of units of local government or any increase in the level of any activity or service previously required by the state of units of local government (Const 1963, art 9, § 29).

3. CONSTITUTIONAL LAW — TITLE-OBJECT CLAUSE.

Challenges to a statute's compliance with the Title-Object Clause of the Michigan Constitution are of three types: a "title-body" challenge, which asserts that the body of the statute exceeds the scope of the title; a "multiple-object" challenge, which asserts that the body embraces more than one object; and a "change of purpose" challenge, which asserts that the subject matter of the amendment is not germane to the original purpose (Const 1963, art 4, § 24).

4. Constitutional Law — Federal Preemption.

    Federal law preempts state law in three circumstances: where Congress has expressed an intent to preempt state law, where state law regulates conduct in a field that Congress intended to occupy exclusively, and where state law actually conflicts with federal law (US Const, art VI, cl 2).

*Plunkett & Cooney, P.C.* (by *Patricia Irving Cwiek, Jeffrey C. Gerish, Kenneth L. Lewis,* and *Seymour M. Nayer*) (*Pollard, Albertson, Nyovich & Higdon, P.C.,* by *Dennis Pollard,* of Counsel), and *Ben Washburn* for the plaintiffs.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Saul A. Green, Carl H. von Ende, Terence A. Thomas, Sr.,* and *Donald W. Myers*), *Robert E. Murphy, Robert S. Gazall,* and *Genelle M. Allen* for Wayne County Airport Authority and others.

*Robert E. Murphy* and *Robert S. Gazall* for Chairman of the Board of the Wayne County Airport Authority.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Michael G. Frezza,* Assistant Attorney General, for state of Michigan and others.

*Axe & Ecklund, P.C.* (by *John R. Axe* and *Peter S. Ecklund, Jr.*), for Wayne County Treasurer.

Before: Hood, P.J., and White and O'Connell, JJ.

Hood, P.J. Plaintiffs, who commenced this original action[1] pursuant to 2002 PA 90 (MCL 259.108 *et seq.*)[2]

---

[1] This Court is authorized to hear certain original actions. *Lapeer Co Clerk v Lapeer Circuit Judges,* 465 Mich 559, 566; 640 NW2d 567 (2002).

[2] Jurisdiction for this original action is provided for in Act 90 itself:

and MCR 7.206, seek declaratory and injunctive relief in the context of their constitutional challenge to Act 90. Plaintiffs object to the transfer by Act 90 of operational jurisdiction of two airports from Wayne County to a statutorily created airport authority. Defendant Raymond Wojtowicz, the Wayne County Treasurer, filed a cross-complaint seeking in part a declaration regarding the procedures for the transfer of money and assets pursuant to Act 90. This Court directed the parties to file cross-motions for summary disposition.

We hold that plaintiffs' Headlee violation claim regarding the requirement of Act 90 that a county continue to employ airport employees who choose not to transfer to the airport authority is not ripe for adjudication and thus do not decide this issue. Plaintiffs may raise this claim in future litigation should the number of airport employees who choose not to transfer prove to be more than de minimis. With regard to plaintiffs' claim that the employee pensions constitute an unfunded new activity under Headlee, we observe that under Act 90, subsection 117(1)(d), the airport authority assumes, and is responsible for paying, the pensions. Finally, we hold that plaintiffs have not met their burden of demonstrating that Act 90 is unconstitutional as alleged in the remaining counts of their amended complaint. Accordingly, we grant summary disposition in favor of defendants and

---

The validity of the creation or incorporation of the authority shall be conclusively presumed unless questioned in an original action filed in the court of appeals within 60 days after the creation or incorporation of the authority under this chapter. *The court of appeals has original jurisdiction to hear an action under this subsection.* The court shall hear the action in an expedited manner. The state transportation department is a necessary party in any action under this subsection. [Act 90, subsection 110(4) (emphasis supplied).]

dismiss plaintiffs' claims, except for the Headlee claim relating to the transferring employees, with prejudice.

I

HISTORY

Signed by the Governor in March of 2002, Act 90 amended the Michigan Aeronautics Code, adding chapter VIA, "the public airport authority act," MCL 259.108 to 259.125c. In part, Act 90 created an airport authority to manage and oversee the Detroit Metropolitan Airport (Metro Airport) and Willow Run Airport.[3] Plaintiffs initiated the instant action against defendants[4] to preclude that authority from managing the airports.

Appearing as plaintiffs are the Wayne County Board of Commissioners and four individual commissioners,[5] as well as the County of Wayne. The Board of Commissioners (hereafter the commission) is the legislative body of Wayne County. Wayne County was

---

[3] For ease of reference, this opinion will refer primarily to Metro Airport, although the airport authority oversees Willow Run as well.

[4] For ease of reference, certain defendants in the instant action will be referred to as "the state defendants," which include: the state of Michigan, the Governor of Michigan (John Engler), the Michigan Department of Transportation, and the Michigan Department of Transportation Director (Greg Rosine). Other defendants, "the county defendants," include: the Wayne County Airport Authority (the WCAA), the Wayne County Airport Authority Chairman (Wayne Doran), the Wayne County Executive (Edward McNamara), the Wayne County Chief Financial Officer (Thomas Naughton), and the Wayne County Airport Authority Director (Lester Robinson). The Wayne County Treasurer (Raymond Wojtowicz) has filed a cross-complaint.

[5] Those commissioners include: Ricardo Solomon, Chairman of the Commission; Kay Beard, Vice-Chair; Jewell Ware, Vice-Chair Pro Tem; and Robert Blackwell, Chairman of the commission's Committee on Airports.

organized as a charter county pursuant to the state constitution, Const 1963, art 7, § 2, and pursuant to statute, MCL 45.1. The Wayne County Home Rule Charter, adopted in November of 1981 and effective in 1983, sets forth the powers of the commission. Under the charter, the commission has the authority to, among other things, adopt resolutions, appropriate funds, levy taxes, authorize borrowing, approve county contracts, approve appointments made by the county executive, override a veto of the county executive by a ⅔ majority, approve rules of county departments, and exercise powers granted by law to other counties unless expressly prohibited.[6]

In 1927, 1927 PA 182 gave Wayne County the authority to acquire land for Metro Airport, which was established in 1928. Before the enactment of Act 90, the county operated Metro Airport under the authority of the Michigan Aeronautics Code, MCL 259.1 *et seq.*[7] Plaintiffs note that the value of the property and assets of Metro Airport and Willow Run Airport exceeds $2.1 billion and the annual revenue exceeds $200 million.[8]

In the 1990s, allegations of mismanagement of Metro Airport arose. In 1999, the state Legislature created a five-member joint committee[9] to investigate the

---

[6] See County Charter, § 3.115 and MCL 46.11.

[7] For a time, the Wayne County Road Commission operated Metro.

[8] Note that the airports are funded completely by landing fees, concessions, parking, rental, and other revenues generated from airport activities. *Report of the Michigan Senate Detroit Metro Airport Review Committee*, October 25, 2001, p 1.

[9] The committee consisted of five senators—two Democratic and three Republican.

mismanagement. In October of 2001, the committee[10] issued a 200-page report[11] identifying general problems, which included improper procedures for airport contracts,[12] auditing discrepancies,[13] a management culture with questionable ethical conduct,[14] and difficulties with the airport police.[15]

As a result of that report, the Michigan Legislature introduced bills to address the mismanagement issues. Before that legislation was passed, the county executive, the Governor, and business leaders reportedly agreed on the creation of a new authority to operate the airport.[16] Apparently, that agreement

---

[10] The two Democratic senators on the committee ultimately declined to sign the report but the three Republicans senators included their signatures as approving it.

[11] The full report may be found at www.senate.state.mi.us/gop/airportreport/fullreport.pdf.

[12] For example, the Waterland Trucking, Inc., employee parking lot expansion contract involved substantial change orders, initiated by airport management: "Ten change orders totaling over $250,000 (45 percent of the original lump sum amount) were added to the contract for a total price of over $803,000. Amazingly, three of the ten change orders were issued *after* the October 19, 1997, completion date." Neither the original contract, nor the change orders, were approved by the commission. *Report of the Michigan Senate Detroit Metro Airport Review Committee,* p 183.

[13] The senate report reflects that "[t]he Commission consistently approves Airport budgets that do not reflect the Airport's actual expenditures. For example, in Fiscal Year 1995-96, the Commission appropriated $295,767,450, yet the Airport maintains it spent only $143,766,538." *Senate Report,* p 82.

[14] As one example, the investigator learned that county employees regularly failed to timely submit annual disclosures of conflict of interest, and although this is an offense meriting sanctions, the investigator could not determine whether any county employee had been disciplined. *Senate Report,* pp 57-58.

[15] For instance, three airport police officers were assigned to security detail for the Wayne County Executive. *Senate Report,* p 95.

[16] See the House Legislative Analysis, SB 690, March 12, 2002.

culminated in Senate Bill 690 which, in turn, was adopted by the Legislature as Act 90.[17]

## ACT 90

Act 90 adds a chapter, the "public airport authority act," to the Michigan Aeronautics Code. As indicated in the revised title of the act, Act 90 provides for the incorporation of "public airport authorities" (PAAs) and provides for the transfer of airport management to PAAs. PAAs automatically will be created for only "qualified airports," which are those with ten million or more enplanements[18] in a twelve-month period,[19] Act 90, subsection 109(n). A local government with airports that are not "qualified," may declare an intention to incorporate a PAA, subsection 110(3).[20] A PAA will be considered a public agency of the local government: "Except as otherwise provided under this chapter, an authority created under or pursuant to this section shall be a political subdivision and instrumentality of the local government that owns the air-

---

[17] The House passed Act 90 with a vote of seventy-five yeas and thirty-one nays; the Senate passed it with twenty-eight yeas, eight nays and two excused absences. Therefore, each house passed the bill with more than a two-thirds vote.

[18] "Enplanements" essentially parallel the number of passengers. The statute defines an enplanement as "a domestic, territorial, or international revenue passenger who boards an aircraft at an airport in scheduled or nonscheduled service of aircraft in intrastate, interstate, or foreign service and includes an in-transit passenger who boards an international flight that transits an airport in the United States for nontraffic purposes," Act 90, subsection 109(g).

[19] Plaintiffs assert that Metro Airport currently is the only "qualified" airport in Michigan (Amended Complaint, p 8, ¶ 27). It had sixteen million enplanements in 2001. House Legislative Analysis, SB 690, March 12, 2002.

[20] If a local government declares such an intent, the local government must hold a public hearing before a PAA may be created, subsection 110(3), which is not true for Metro Airport because Act 90 automatically creates the PAA in Wayne County.

port and shall be considered a public agency of the local government for purposes of state and federal law," subsection 110(1).[21] A PAA also appoints the airport manager, subsection 110(1).

A PAA, in turn, is governed by a board that consists of seven members, subsections 109(d), (e). The Governor appoints two board members, the executive officer of the local government (in this case, the Wayne County Executive) appoints four members and the local government that owns the airport (in this case, the commission) appoints the final board member, subsection 111(2). The initial appointees will be allotted terms of two to eight years, respectively, with later full-term appointments to be six years, subsection 112(1), and board members may not serve more than two terms, subsection 112(2). In general, board members may not have ties to the airport or a conflict of interest, subsection 111(5). The board appoints a chief executive officer, who then appoints a chief financial officer, who will be responsible for receiving all monies. Subsections 111(8), (9). Other sections of Act 90 pertain to board meetings and various policies.[22] Act 90 also sets forth the financial

---

[21] Plaintiffs, however, contend that Act 90 "expressly states that the newly created airport authority is a separate public corporation and agency of the state of Michigan." Plaintiffs did not provide a citation for that conclusion, but stated in oral argument that a PAA cannot be a county agency because Act 90, § 116 gives PAAs greater powers than those conveyed to other local agencies under the Wayne County Charter. The plain language of § 110, however, provides that PAAs are local agencies, which is discussed further in this opinion.

[22] Section 113 sets forth the parameters of the board's meetings. Subsections 114(1), (2), (3) discuss auditing and an auditing committee, as well as procedures for the selection and retention of a certified public accounting firm. Subsections 114(4), (5) discuss the duties of a PAA's chief executive officer. Subsection 114(6) involves contracting policies; subsection 7, leasing; subsection 8, minority businesses; subsection 9, conflicts

aspects of PAAs, including methods of raising revenue and bonds.[23]

Once a PAA is created, the local government that owns the airport must not impede the PAA's exercise of powers, must refrain from selling or transferring airport facilities without the PAA's consent, must cure any defects in title to airport facilities, must grant any necessary easements or licenses, and must maintain the airport roads, subsection 118(3). Further, if the PAA so requests, the local government must provide transitional services regarding the airport operation until the PAA assumes those services; the PAA will pay the government for those services, subsection 118(4). When operational jurisdiction has been transferred to a PAA, the legislative body of the local government may, with the PAA's consent, pledge its full faith and credit for the obligations of the PAA, advance funds to the PAA, and grant or convey real or personal property to the PAA, subsection 125(1).

Finally, § 125c is a severability clause and provides:

> If any portion of this chapter or the application of this chapter to any person or circumstances is found to be invalid by a court, that invalidity shall not affect the remaining portions or applications of this chapter, which can be given effect without the invalid portion or application, as long as the remaining portions are not determined by the

---

of interest; and subsection 10, an ethics manual. Section 115 discusses the budget and section 116 identifies a PAA as a public body and sets forth the powers of a PAA.

[23] A PAA may raise revenue, but may not levy a tax or special assessment, § 120. Under § 122, a PAA may issue self-liquidating bonds. A PAA also may borrow money or issue municipal securities, § 123. PAA-issued bonds and other indebtedness are free from taxation, § 124. Under § 125a, a PAA may enter into an interest rate exchange or swap, with certain conditions. Section 125b discusses bonds.

court to be inoperable; and to this end, this chapter is declared to be severable. [Act 90, § 125c.]

## THE TRANSFER

In August of 2002, the Federal Aviation Administration (FAA) issued an airport operating certificate to the WCAA, thus setting in motion the "approval date"[24] process pursuant to Act 90. On the approval date, the WCAA assumed the operational jurisdiction of Metro Airport, which, under statute, includes "the exclusive right, responsibility, and authority to occupy, operate, control, and use the airport and the airport facilities . . . ." Act 90, subsection 117(1)(a). That right includes "operational jurisdiction" over airport facilities.[25] Act 90, subsection 117(3)(a). Further, the WCAA acquired all contracts with airlines, tenants, concessionaires, leaseholders, and others; financial obligations; cash balances; and office equipment, subsection 117(4).

Under Act 90, the transfer of authority from the county to the WCAA may not impair any contracts with airlines, vendors, tenants, bondholders, or certain other parties, subsection 118(1). Upon the transfer,

---

[24] Act 90 defines "approval date" as

the effective date of the issuance by the [FAA] to the authority assuming operational jurisdiction of an airport of a certificate under part 139 of chapter 14 of the code of federal regulations with respect to the airport, and the concurrence by the FAA of the designation of the authority as a sponsor of the airport, including the FAA's approval of the assignment of existing grant agreements to the authority. [Act 90, subsection 109(c).]

[25] Such facilities "includ[e], but [are] not limited to, all terminals, runways, taxiways, aprons, hangars, aids to air navigation, emergency vehicles or facilities, parking facilities for passengers and employees, and buildings and facilities used to operate, maintain, and manage the airport, subject to any liens . . . ." Act 90, subsection 117(3)(a).

the WCAA assumed all further costs and responsibility arising from the control of the airport, "except as otherwise required under obligations retained by the local government under this chapter or as otherwise agreed by the local government." Act 90, subsection 118(2).

Once the transfer occurred, county employees working at Metro Airport could choose to transfer to the WCAA for employment. Those employees who choose not to transfer to the WCAA "shall be reassigned" within the county. For one year, the county may not reduce the pay or benefits of any county employee into whose position a county employee who was previously employed at the airport is reassigned. Act 90, subsection 119(2). The parties dispute the number of county employees who work at Metro and who have declined to transfer to the WCAA. Defendants claim that the number is two; plaintiffs claim that the number ultimately could be as high as seven hundred given that employees have one year in which to make their decision.

### THE FEDERAL SUIT

Meanwhile, on April 22, 2002, plaintiffs[26] filed an action in the United States District Court for the Eastern District of Michigan. In addition to the defendants to this action, plaintiffs also named as defendants in the federal suit the FAA and its administrator, Jane Garvey. That case, however, was dismissed pursuant to an order of June 25, 2002, signed by United States District Judge John Corbett O'Meara, who granted

---

[26] Note that Wayne County was not named as a party plaintiff in the federal suit.

plaintiffs' motion for voluntary dismissal and dismissed plaintiffs' amended complaint without prejudice.[27]

On May 24, 2002, plaintiffs filed the instant original action in this Court, Docket No. 241521. In plaintiffs' amended complaint, they allege: the transfer of authority will impair the county's contractual obligations to bondholders contrary to the state and federal constitutions (count I); Act 90 is contrary to the Headlee Amendment of the Michigan Constitution because it requires new activities that are unfunded (count II); the transfer to the airport authority will cause the county to default on contractual obligations to third parties (count III); certain directives to county officials under Act 90 constitute a prior restraint on political speech (count IV); Act 90 is constitutionally invalid given the limited power of the Legislature over local units of government (count V); Act 90 contravenes the Michigan Constitution, which prohibits the lending of credit by the county to any public or private agency (count VI); Act 90 is invalid under the Title-Object Clause where Act 90 interferes with the Revenue Bond Act of 1933 (count VII); Act 90 is invalid under the Michigan Constitution as special or local legislation (count VIII); and the Federal Aviation Act preempts Act 90 (count IX). Plaintiffs ask this Court to declare Act 90 invalid and enjoin the transfer

---

[27] At the time this opinion was drafted, the federal case was pending, because plaintiffs had filed a motion to alter or amend the dismissal in response to the possibility that the federal court would award attorney fees to defendants.

of funds to defendants, to declare unenforceable the directives of Act 90 regarding the actions of Wayne County officials, and to declare Act 90 unconstitutional.

### THE CROSS-COMPLAINT

Defendant Raymond Wojtowicz, the Wayne County Treasurer, filed a cross-complaint on June 28, 2002, Docket No. 242406, seeking in part a declaration regarding the procedures for the transfer of money and assets pursuant to Act 90. Wojtowicz alleges that the instant suit challenges not only Act 90, but his right to transfer money and assets to the WCAA (Cross-Complaint, ¶ 11). Wojtowicz states that he faces the potential of civil and criminal sanctions if he transfers assets to the WCAA in the event that any of the alleged defects are established in the instant litigation (Cross-Complaint, ¶ 12).

### EXPEDITED PROCEEDINGS IN THIS COURT

Pursuant to Act 90's mandate, this Court proceeded to give expedited consideration to the cases, which it consolidated. In the first seven weeks the cases were pending, the parties filed a dozen motions. The Court thereafter ordered that the cases proceed to a full hearing and held a status conference on August 8, 2002. On that date, the Court issued a scheduling order, with oral argument to occur on September 24, 2002. The Court held an additional status conference on September 3, 2002.

THE BYPASS

In the interim, on August 19, 2002, the Governor sent an executive message to our Supreme Court, requesting it to authorize this Court to certify the questions raised in the instant litigation. The Supreme Court thereafter issued an order directing this Court to accelerate its briefing and oral argument schedule in order to deliver its opinion no later than September 24, 2002. *In re Executive Message from the Governor*, 467 Mich 1209 (2002).

II

This action invokes myriad standards of review. Plaintiffs have asked this Court to rule on the constitutionality of Act 90. Review of the constitutionality of a statute presents a question of law. *Tolksdorf v Griffith*, 464 Mich 1, 5; 626 NW2d 163 (2001). A party challenging the facial constitutionality of a statute must establish that no circumstances exist under which it would be valid. *Taylor v Gate Pharmaceuticals*, 248 Mich App 472, 477; 639 NW2d 45 (2001), lv gtd 466 Mich 889 (2002). " 'The fact that the . . . [a]ct might operate unconstitutionally under some conceivable set of circumstances is insufficient . . . .' " *Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 568; 566 NW2d 208 (1997) (quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 [1987]). In this case, then, the panel must determine whether Act 90 is capable of *any* construction that would make it constitutional. See *Michigan United Conservation Clubs v Dep't of Treasury*, 239 Mich App 70, 76; 608 NW2d 141 (1999), aff'd 463 Mich 995

(2001). A party challenging the facial constitutionality of a statute faces an extremely rigorous standard. *Judicial Attorneys Ass'n v Michigan,* 459 Mich 291, 310; 586 NW2d 894 (1998).

The parties have filed cross-motions for summary disposition under MCR 2.116. Defendants have raised MCR 2.116(C)(8), which tests the sufficiency of the plaintiff's claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. *Koenig v South Haven,* 460 Mich 667, 674; 597 NW2d 99 (1999). The court must grant the motion if no factual development could justify the plaintiff's claim for relief. *Id.*

The parties likewise rely on MCR 2.116(C)(10). In deciding a motion pursuant to MCR 2.116(C)(10), we consider affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in a light most favorable to the nonmoving party. *Maiden v Rozwood,* 461 Mich 109, 119-120; 597 NW2d 817 (1999). Where the proffered evidence fails to establish a genuine issue of material fact, the moving party is entitled to judgment as a matter of law. *Id.* at 120. A litigant's mere pledge to establish at trial that a genuine issue of material fact exists is not sufficient to overcome summary disposition. *Id.*

III

A

The parties have raised interesting issues regarding whether plaintiffs have the legal capacity to sue, whether plaintiffs have standing on each issue,[28] and

---

[28] Judge O'CONNELL notes that, in his view, plaintiffs do not have standing to assert claims under count I, the impairment of contracts, because

whether Wayne County should remain as a party plaintiff. Those procedural issues, however, do not affect the ultimate question of the constitutionality of Act 90. We therefore decline to rule on defendants' motions to dismiss on those grounds. Given our Supreme Court's mandate in *In re Executive Message from the Governor, supra,* this Court will proceed immediately to an analysis of the constitutional issues.

B

In count I of their amended complaint, plaintiffs assert that the transfer of authority to the WCAA will impair Wayne County's obligations to bondholders, which is contrary to the federal and state constitutions. We disagree.

Plaintiffs contend that the commission has enacted ordinances to borrow funds to improve the facilities at Metro Airport and that the funds are to be repaid through the "revenues produced by the County's operation and management of [Metro and Willow Run] Airports." The county thereafter issued municipal bonds, which remain outstanding. Plaintiffs assert that a condition of those bonds is that the county would "not sell, transfer, assign or otherwise dispose of all or any part of the properties constituting the Airport."

---

plaintiffs cannot show the requisite harm. Likewise, plaintiffs do not have standing, in his opinion, to bring count III, the impairment of third-party contracts. Judge O'CONNELL also is of the opinion that Wayne County should be dismissed as a party plaintiff to this lawsuit. Under the present factual circumstances, the Wayne County Board of Commissioners has neither the capacity nor the standing to represent the entity known as Wayne County.

In arguing that Act 90 is unconstitutional, plaintiffs rely on the following provision: "No bill of attainder, ex post facto law or *law impairing the obligation of contract* shall be enacted." Const 1963, art 1, § 10 (emphasis supplied). See also US Const, art I, § 10. Plaintiffs allege that Act 90 will interfere with the county's obligations under contract in two ways: (1) it will cause a breach of the county's commitment to the bondholders because the county no longer will have control over the revenues that are the primary source of repayment for the bonds and (2) it will cause the county to breach its pledge not to sell, transfer, assign, or otherwise dispose of the property while the bonds are outstanding (Amended Complaint, p 15, ¶ 54). We begin, however, with the presumption that the legislation is constitutional. *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 728; 575 NW2d 63 (1997). Thus, plaintiffs have the burden of proving that Act 90 violates the constitution.

In examining Contract Clause claims, this Court has adopted the federal balancing approach, which weighs the extent of the impairment on the rights and obligations of the contracting parties against the state's police power to regulate in the public interest. *Blue Cross & Blue Shield of Michigan v Governor*, 422 Mich 1, 21; 367 NW2d 1 (1985). It requires courts to undertake the following analysis:

> 1—The first inquiry is "whether the state law has, in fact, operated as a *substantial* impairment of a contractual relationship" . . . .[29]

---

[29] "[T]he severity of the impairment determines the height of the hurdle the act must clear." *Ludington & N R Co v Epworth Assembly*, 188 Mich App at 25, 41; 468 NW2d 884 (1991).

2—A critical factor to be considered in determining the extent of the impairment is "whether the industry the complaining party has entered has been regulated in the past . . . ."

3—If the impairment is minimal, then there is no unconstitutional impairment of contract and our inquiry may end at this step.

4—If, however, the impairment is severe, then there are two further inquiries, both of which must be affirmatively shown to justify the legislative impairment:

a) Is there a significant and legitimate public purpose behind the regulation, *and*

b) If there is a legitimate public purpose, are the means adopted to implement the legislation reasonably related to the public purpose? [*Id.* at 23.]

Legislation regarding the rights and responsibilities of contracting parties must be based on reasonable conditions and serve a legitimate public purpose. *Ludington & N R Co v Epworth Assembly,* 188 Mich App 25, 41; 468 NW2d 884 (1991). One aim of Act 90 is the improved operation of Michigan's airports, which qualifies as a legitimate public purpose. In its specific application here, Act 90 removed management control of Metro Airport from the county (and the commission) and placed control with the WCAA. Given plaintiffs' concession that Metro Airport had been poorly managed in the past,[30] the attempt by Act 90 to cure the management deficiencies at Metro would be a legitimate public purpose.

Plaintiffs argue that the transfer to the authority by way of §§ 117 and 118 of Act 90 impairs their contract with the bondholders because the county no longer

---

[30] Plaintiffs stated in their motion: "The[] audits [prompted by the commission] . . . revealed a pattern of mismanagement and corrupt practices [at Metro]."

has control of the source of revenue to repay the bonds where it has transferred the airport to the WCAA. The following sections of Act 90 are pertinent:

> (c) The authority assumes, accepts, and becomes liable for all of the lawful obligations, promises, covenants, commitments, and other requirements in respect of the airport of the local government that owns the airport, under the operational jurisdiction of the authority, whether known or unknown, contingent or matured, but excepting any full faith and credit pledge of the local government in respect of bonds issued by the local government for airport purposes . . . . [Act 90, subsection 117(1)(c).]

> \*   \*   \*

> (2) Upon the transfer of operational jurisdiction over an airport pursuant to section 117, a local government shall be relieved from all further costs and responsibility arising from or associated with control, operation, developments, and maintenance of that airport, except as otherwise required under obligations retained by the local government under this chapter or as otherwise agreed by the local government. [Act 90, subsection 118(2).]

Although Act 90 requires the transfer, it also provides that the PAA—in this case the WCAA—accepts the liability for those bonds. Thus, both the revenue and the obligations under the bonds are transferred to the WCAA. Therefore, with respect to the bonds, we cannot conclude that Act 90 operates as a *substantial* impairment of contract. *Blue Cross Blue Shield, supra*, holds that if the impairment is minimal, then the analysis ends—no constitutional impairment exists.

Further, we are not convinced that the transfer of the operational jurisdiction from plaintiffs to the WCAA is, as plaintiffs complain, "directly contrary to the express contractual commitment made by the County

to . . . existing bondholders." The pledge not to transfer airport property was meant to ensure that assets necessary to generate the revenue remain dedicated to that purpose. That fact has not changed: the airport property will remain subject to airport purposes and the revenue will continue to fund the bonds. Plaintiffs simply have not shown that the bondholders have a contractual entitlement to retain the commission as the airport manager, as distinguished from a new agency controlled by the board as set forth by the statute.

We do not find dispositive *United States Trust Co v New Jersey*, 431 US 1; 97 S Ct 1505; 52 L Ed 2d 92 (1977), a case on which plaintiffs rely, because in that case the New Jersey legislature attempted to repeal a condition of the bonds that barred the use of port revenues to fund passenger rail service. In contrast, Act 90 does not operate to change a condition of the bonds so that airport revenue could be used to finance, for example, subway mass transit. Thus, *United States Trust* involved a change in the permissible use of revenues in relation to the bonds, a matter of vital concern to the bondholders. This case does not involve the repeal of a promise regarding the use of revenue and is not brought by bondholders.

Assuming arguendo that the contract is substantially impaired, plaintiffs still do not prevail. As plaintiffs characterize it, the alleged impairment to the bonds here cannot be maintained if "an evident and more moderate course would serve [the Michigan Legislature's] purposes equally well." See 431 US 29. Considering that plaintiffs themselves admit that Metro has been poorly managed for years, and that plaintiffs were the entities responsible for operating Metro for those years, the Legislature's transfer of

operational jurisdiction meets the test in *United States Trust.* Further, the Contract Clause cases consider whether the industry at issue has been regulated in the past. *Blue Cross Blue Shield, supra* at 23. It is axiomatic that the airline industry is highly regulated at the federal, state, and local levels. The same may be said of municipal bonds. Accordingly, plaintiffs have been playing in a field subject to many previous regulations.

C

Plaintiffs next assert, in count II of the amended complaint, that Act 90 imposes an "unfunded" requirement that violates the Headlee Amendment, Const 1963, art 9, § 29. In their motion, plaintiffs rely on the second sentence of § 29:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. *A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs.* The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18. [Const 1963, art 9, § 29 (emphasis supplied).]

The purpose of this sentence[31] was to ensure that the state would fund any new activity or fund any increase in the level of any activity required by the

---

[31] The sentence has been referred to as the Prohibition-of-Unfunded-Mandates Clause, or POUM. *Adair v Michigan,* 250 Mich App 691, 694; 651 NW2d 393 (2002).

state. *Wayne Co Chief Executive v Governor*, 230 Mich App 258, 265; 583 NW2d 512 (1998). In other words, Headlee focuses on state-mandated activities requiring local funding. *Detroit Mayor v Michigan*, 228 Mich App 386, 401; 579 NW2d 378 (1998), aff'd in part and vacated in part 460 Mich 590; 597 NW2d 113 (1999). Specifically, the above sentence becomes operational only by "a mandate that requires local units to perform an activity that the state previously did not require local units to perform or at an increased level from that previously required of local units." *Judicial Attorneys Ass'n v Michigan*, 460 Mich 590, 606; 597 NW2d 113 (1999).

Our Supreme Court has interpreted that the Legislature intended the Headlee Amendment to apply only to increases in the level of those services and activities that state law mandates in the first instance. *Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 643; 425 NW2d 65 (1988). The Legislature intended § 29 to impose an obligation on the state in relation to each unit of local government with respect to mandated activities as well as new requirements. *Schmidt v Dep't of Ed*, 441 Mich 236, 251; 490 NW2d 584 (1992). The Headlee Amendment was intended to limit legislative expansion of requirements placed on local government spending, to limit excessive government spending, and to lower taxes at both the state and the local level. *Mahaffey v Attorney General*, 222 Mich App 325, 341; 564 NW2d 104 (1997).

Plaintiffs first take issue with Act 90, subsection 119(2), which requires the county to reassign airport employees who do not elect to transfer to the WCAA. As previously indicated, the parties dispute the number of nontransferring employees. Indeed, any num-

ber would be purely speculative where the employees have a year in which to choose to transfer. We therefore decline to address this issue at this time because it is not ripe. See *Straus v Governor*, 459 Mich 526, 544; 592 NW2d 53 (1999). Plaintiffs may raise this issue at a future date should the number of nontransferring employees prove significant.

Plaintiffs then argue that Act 90, subsection 119(3) is unfunded because it requires the county to contribute to the pensions of WCAA employees until the WCAA forms its own pension plan. Defendants conceded at oral argument that, under Act 90, subsection 117(1)(d),[32] the WCAA assumes unfunded obligations relative to pensions. Accordingly, we declare that the WCAA is responsible for funding the employee pensions pursuant to Act 90, subsection 117(1)(d).

Next, plaintiffs assert that Act 90, subsection 118(3)(c) impermissibly requires the county to assume the costs of airport title insurance, legal fees, and acquisition costs. To support their allegations regarding the title and the transfer, plaintiffs merely argue: "Again, these are new activities or services for which no appropriation or disbursement has been made." Plaintiffs have failed to demonstrate that they are entitled to summary disposition as a matter of law on this point. *Maiden, supra.* It is logical to conclude that, as owner of the airport, the county has been responsible for title insurance, legal fees, and acquisition costs since the inception of Metro, which would mean that the insurance, fees, and costs were not new activities. Moreover, plaintiffs have not shown

---

[32] That section provides, in pertinent part, that "[t]he authority assumes unfunded obligations to provide pensions or retiree health insurance . . . ." Act 90, subsection 117(1)(d).

that Act 90 differs from what state law required of local units in 1978 regarding airport title insurance, legal fees, and acquisition costs, as is required under a Headlee analysis, see *Judicial Attorneys Ass'n, supra,* 460 Mich 606-610.

Plaintiffs also contend that an unfunded activity results from the following passage of Act 90, subsection 111(9):

> The treasurer of any local government receiving or having custody of money or other property belonging to an authority under this chapter shall promptly transfer the money and other property to the custody of the chief financial officer of the authority.

Plaintiffs argue that the transfer increases the burden on general fund revenues to pay for fixed obligations that were incurred in part in reliance on airport revenues. Plaintiffs do not, however, explain or demonstrate how the Headlee Amendment is implicated by this provision of Act 90.

D

Plaintiffs next argue in count III of their complaint that Act 90 will cause the county to default on obligations to third parties in violation of the Impairment of Contracts Clause. As we decided in relation to plaintiffs' count I, we conclude that Act 90 does not operate to impair the county's contracts.

Plaintiffs contend that the establishment of the airport authority will deprive the county of revenue and contributions previously promised to pay contracts and other obligations incurred for services and for capital improvements to support airport operations. According to plaintiffs, Act 90 permits, but does not

require, the airport authority to honor those obligations. (Plaintiffs' Amended Complaint, ¶¶ 69-70.)

With respect to existing contracts, the statute requires the WCAA to honor those contracts. Act 90 provides for the assumption of liabilities by the airport authority. See, e.g., subsection 118(1), which provides: "The transfer of the operational jurisdiction over an airport to the authority may not in any way impair any contracts with airlines, vendors, tenants, bondholders, or other parties in privity with the local government that owns the airport . . . ." See also subsection 117(1)(c), cited in footnote 45, *infra*. Therefore, Act 90 plainly states that the transfer will not impair contracts.

Plaintiffs appear to further assert that the transfer will result in lost revenues to the county, which will then result in the county's failure to meet its contractual obligations to third parties. We note that plaintiffs' claims under this issue are purely speculative. Plaintiffs claim that Act 90 would "sever" the airport from the county, which "will likely cause the County to default on obligations to its creditors." Plaintiffs have not provided specific facts to support this allegation, but merely allege that at some future date the county might be unable to meet its financial obligations. Without more, plaintiffs have not shown they are entitled to summary disposition. See *Latham v Nat'l Car Rental Systems, Inc*, 239 Mich App 330, 336; 608 NW2d 66 (2000).

Moreover, plaintiffs have not described an impairment of the obligation of contract; they have merely asserted that the legislation may have collateral economic consequences to the county. The same is true respecting plaintiffs' contention that the county "may"

lose $17.2 million in revenues "if" the airport chooses to obtain from elsewhere certain services now provided by the county. Plaintiffs produce no substantiation for their claim that the WCAA will choose to obtain those services elsewhere or, more importantly, that the WCAA's choice would interfere with a specific contract.

Plaintiffs also complain that certain services provided by county departments will not be reimbursed. Plaintiffs rebuff defendants' reliance on subsection 118(4), which provides:

> At the request of an authority, a local government that owns a qualified airport over which operational jurisdiction has been transferred to an authority shall provide the authority with transitional services previously performed by the local government and related to the operation of the qualified airport until the date the authority elects to assume these services. *The reasonable cost of these services shall be paid by the authority.* [Act 90, subsection 118(4) (emphasis supplied).]

Plaintiffs appear to be arguing that the WCAA may choose not to retain the county's services or may not fully reimburse it. These arguments do not fall within the constitutional protection of the Impairment of Contracts Clause. The county has no constitutional right to be the chosen vendor for airport services and the enactment of Act 90 does not automatically mean that the county would not be paid or would be underpaid.

Plaintiffs argue that Act 90 interferes with services provided by Information Technology and Imaging & Office Technology. Plaintiffs have not, however, shown an impairment of a specific contract. Plaintiffs have not demonstrated that an impairment of con-

tracts occurs where the county purchased hardware and software on its *assumption* that it would retain operation and management control of Metro.

E

Plaintiffs next raise a First Amendment claim, arguing that provisions of Act 90 that direct county officials to take certain actions upon penalty of criminal and civil prosecution constitute a prior restraint on political speech (Amended Complaint, count IV, p 20, ¶¶ 74-76). We reject this claim.

Plaintiffs cite a portion of subsection 110(2) as an example of the violation of their right to free speech:

> Officials and employees of the local government and the authority shall actively cooperate with the local government, the authority, this state, and the federal government to the end that the FAA will recognize the authority as the sponsor of the qualified airport, and to obtain FAA approval of the transfers contemplated by this chapter.

Insofar as this section relates to the FAA, plaintiffs' argument on this point is moot: the FAA has given its approval and has recognized the WCAA as the sponsor of Metro.

Plaintiffs next cite the following subsection of Act 90:

> (9) If a local government previously acted as a sponsor and action by, or concurrence of, the local government is required to complete a project related to the airport or airport facilities, the local government shall not withhold, condition, or delay concurrence with any authority action necessary to complete the project in accordance with obligations under applicable federal law, regulations, and assurances associated with accepting grants from the FAA or

any other agency of the United States or this state. [Act 90, subsection 116(9).]

Plaintiffs also complain about the transfer, under § 117, of rights, title, and interest in the fixtures, equipment, materials, furnishings, and other personal property owned and used by the airport to the WCAA. Finally, plaintiffs refer to subsection 118(3), which provides:

(3) A local government that owns an airport for which an authority has been created or incorporated under this chapter shall comply with all of the following:

(a) Refrain from any action that would impair an authority's exercise of the powers granted to the authority under this chapter or that would impair the efficient operation and management of the airport.

(b) Refrain from any action to sell, transfer, or otherwise encumber or dispose of airport facilities owned by the local government for which operational jurisdiction has been transferred without the consent of the authority and, where necessary, the [FAA].

(c) Take all action reasonably necessary to cure any defects in title to airport facilities over which an authority has been transferred operational jurisdiction.

(d) At the request of an authority that has been transferred operational jurisdiction of an airport owned by the local government, grant any license, easement, or right-of-way in connection with the airport to the extent the authority has not been empowered to take these actions.

(e) Upon creation or incorporation of an authority and before the approval date, conduct operations of the airport in the ordinary and usual course of business.

(f) Maintain and repair, including providing snow removal for, any road providing ingress and egress to the airport over which responsibility for maintenance and repair is

retained by the local government pursuant to agreement or law. [Act 90, subsection 118(3).]

These provisions of Act 90 are simply incomparable to cases involving core political speech issues, e.g., *Buckley v American Const Law Foundation, Inc*, 525 US 182; 119 S Ct 636; 142 L Ed 2d 599 (1999) (involving the circulation of ballot-initiative petitions), or *McIntyre v Ohio Elections Comm*, 514 US 334; 115 S Ct 1511; 131 L Ed 2d 426 (1995) (regarding the distribution of anonymous leaflets opposing a tax levy). In contrast, Act 90 does not implicate plaintiffs' free speech rights under the First Amendment; hence, we decline plaintiffs' invitation to rule that Act 90 burdens their core political speech.

F

In count V, plaintiffs next contend that Act 90 is invalid under the constitution because the local government, not a PAA, is to have control over public places such as airports. Plaintiffs first argue that the Legislature did not have the power to create a local unit of government, a PAA, to manage airports. Plaintiffs do not acknowledge Const 1963, art 7, § 27, which provides in part:

Notwithstanding any other provision of this constitution *the legislature may establish in metropolitan areas* additional forms of government or *authorities* with powers, duties and jurisdictions as the legislature shall provide. [Const 1963, art 7, § 27 (emphasis supplied).]

Consequently, the Legislature had the power to create PAAs in metropolitan areas.

In tandem with this argument, plaintiffs contend that PAAs are not actually local government units, but instead are state agencies. We refer to subsection 110(1) of Act 90, which provides:

> [A]n authority created under or pursuant to this section shall be a political subdivision and instrumentality of the *local government* that owns the airport and shall be considered a public agency of the *local government* for purposes of state and federal law. [Act 90, subsection 110(1) (emphasis supplied).]

In interpreting statutes, courts give effect to the intent of the Legislature by reviewing the plain language of the statute itself. *In re MCI Telecommunications Complaint*, 460 Mich 396, 443; 596 NW2d 164 (1999). The plain and unambiguous language of Act 90 indicates that a PAA is a unit of the local government, not of the state.

Plaintiffs, however, assert that the WCAA is not a county agency because airport employees must choose to be employees of the WCAA and cannot remain county employees while working at the airport. Plaintiffs give no authority for their proposition that the transfer of employees necessitates that the WCAA is a state agency. This Court will not search for authority to support a party's position. See *Great Lakes Div of Nat'l Steel Corp v Ecorse*, 227 Mich App 379, 425; 576 NW2d 667 (1998).

Also, plaintiffs argue that if the WCAA was a county agency, no need would exist to transfer licenses, certificates, property, and funds from the county to the WCAA. The plaintiffs' argument notwithstanding, the transfer of operating certificates and funds is logical where the WCAA, not the county, is the entity manag-

ing Metro Airport. The fact that the WCAA holds the certificates, licenses, property, and funds reflects an efficient operation, and does not mean that the WCAA is a state agency. The goal of Act 90, the efficient operation of Michigan's airports, would be impeded if the county retained operating certificates where the WCAA is managing Metro Airport.

Plaintiffs also contend that the WCAA is an agency of the state because the governing officers of the WCAA were not elected by popular vote, citing *Metropolitan Police Bd of Detroit v Bd of Auditors of Wayne Co*, 68 Mich 576; 36 NW 743 (1888).[33] Taken to its logical conclusion, that argument would mean that any agency would be a state agency where the members were appointed rather than elected, a result this Court rejects.

Plaintiffs also claim that Act 90 violates art 7, § 29 of the Michigan Constitution, which provides:

> No person, partnership, association or corporation, public or private, operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other utility facilities, without the consent of the duly constituted authority of the county, township, city or village; or to transact local business therein without first obtaining a franchise from the township, city or village. *Except as otherwise provided in this constitution the right of all counties,* townships, cities and villages *to the reasonable control* of their highways, streets, alleys and public places is hereby reserved to such local units of government. [Const 1963, art 7, § 29 (emphasis supplied).]

---

[33] *Metropolitan Police Bd* involved a local police board in Detroit that drew funds from the county to work in several townships outside the jurisdiction of Detroit. *Id.* at 581.

Earlier cases from this Court have interpreted the "reasonable control" phrase in this constitutional provision and have determined that the control exercised by local units of government is limited and not exclusive. For example, defendants cite *Jones v Ypsilanti*, 26 Mich App 574; 182 NW2d 795 (1970), where the defendant city disputed that it had jurisdictional control over the sidewalk abutting a state trunkline highway where the plaintiff slipped and fell. The *Jones* defendant relied on Const 1963, art 5, § 28, which established the state highway commission and gave the commission control over highways. The plaintiff in *Jones*, however, argued that Const 1963, art 5, § 28 should be considered together with Const 1963, art 7, § 29, which led to the conclusion that the state's control was paramount—but not exclusive. *Jones, supra* at 578-579.

The *Jones* Court then quoted the following passage from *Allen v State Hwy Comm'r*, 338 Mich 407, 415; 61 NW2d 625 (1953):

> "The reasonable control of streets reserved to cities under the Constitution . . . does not give them exclusive control, preventing the State from assuming any control over State trunk line highways running through cities." [*Jones, supra* at 580.]

The *Jones* Court subsequently concluded:

> Reading the two constitutional provisions relating to control of highways with reference to each other and in light of existing law when the provisions were framed, we believe that municipalities were meant to retain reasonable control over state trunkline highways located within their boundaries so long as that control pertains to local concerns and does not conflict with the paramount jurisdiction of the state highway commission. [*Id.*]

Likewise, here the county retains reasonable control over its roads and public places. That control, however, is not exclusive and must give way to matters of statewide concern, including Metro Airport. See also *Erwin Twp v Gogebic Co Bd of Rd Comm'rs*, 265 Mich 115, 119; 251 NW 357 (1933), holding that when provisions of the constitution regarding control over roads are read together, no conflict occurs; the provisions regarding local control and state control are harmonious.

Returning to the constitutional provision at issue, even assuming arguendo that Const 1963, art 7, § 29 applies here to the roads and public places connected with Metro Airport, the cases cited by plaintiffs are not dispositive. Consider *Dearborn v Michigan Turnpike Authority*, 344 Mich 37; 73 NW2d 544 (1956), which addressed the constitutionality of the turnpike act in conjunction with the "North-South Turnpike." Our Supreme Court quoted *Allen, supra,* which considered the phrase "reasonable control" in the above constitutional provision:[34]

> "The right to reasonable control of their streets is not a gift of an arbitrary prerogative to the cities, villages and townships. The reasonableness of the city's control of its streets is not to be within the final determination by the city in all cases, for that in practical effect could erase the word 'reasonable' from the constitutional provision. The reasonableness may be determined in accordance with the State legislature's interpretation in some instances provided that such interpretation can be approved by the court." [*Dearborn, supra* at 53 (quoting *Allen, supra* at 415-416).]

---

[34] At that time, the section at issue was contained in art 8, § 28.

That passage indicates that the county does not have an absolute privilege regarding the use of its roads. Instead, the Legislature has authority, in some instances, to determine the reasonableness of a county's control of its streets. In Act 90, the Legislature determined that the entity managing the airport should have control of the airport property, easements, rights of access, and appurtenances. Where airports are governed by state regulation in the Michigan Aeronautics Code, it logically follows that the Legislature would be the proper body to determine which entity, the county or the WCAA, should have control over the airport roads.

Further, it is curious that plaintiffs cited in their favor *Detroit, Wyandotte & Trenton Transit Co v Detroit*, 260 Mich 124; 244 NW 424 (1932), in which our Supreme Court ruled that the city could not regulate jitneys, which are small automobiles or buses that follow a regular route and transport passengers, because the city's regulation interfered with the state's jurisdiction. While the Court acknowledged that the city had a right of "reasonable control" over its streets, the Court observed that the state had taken control of the regulation of this area and thus the ordinance was invalid. *Id.* at 129.

Likewise, here the Legislature has the power to regulate the powers and duties of counties in relation to highways and airports pursuant to Const 1963, art 7, § 16, which provides in pertinent part:

> The legislature may provide for the laying out, construction, improvement and maintenance of highways . . . and airports by the state and by the counties . . . and may authorize counties to take charge and control of any highway within their limits for such purposes. The legislature

may provide the powers and duties of counties in relation
to highways . . . and airports . . . .

Accordingly, the county's attempt to retain control of
the streets related to the airport and airport facilities
must yield to the Legislature's power to regulate air-
ports under the constitution.

G

1

Plaintiffs argue in count VI of their amended com-
plaint that Act 90 is invalid because a county may not
lend credit to any private or public agency or "an
autonomous agency created by the state." The Michi-
gan Constitution provides that "[t]he credit of the
state shall not be granted to, nor in aid of any person,
association or corporation, public or private, except
as authorized in this constitution." Const 1963, art 9,
§ 18. The prohibition against the lending of credit
applies to counties as political subdivisions and
instrumentalities of the state. See *Advisory Opinion
on Constitutionality of 1986 PA 281*, 430 Mich 93;
422 NW2d 186 (1988); *Oakland Co Drain Comm'r v
Royal Oak*, 306 Mich 124, 142; 10 NW2d 435 (1943).
The purpose of this section is to make certain that
the state, which generally cannot borrow, does not
accumulate unauthorized debts by guaranteeing the
debts of others. *Advisory Opinion re Constitutional-
ity of 1966 PA 346*, 380 Mich 554, 564; 158 NW2d 416
(1968).

This Court reiterated the following principles in
conjunction with the lending of credit:

Our Supreme Court has held that where the state acquires or transfers something of value, Const 1963, art 9, § 18 is not violated. *Alan v Wayne County*, 388 Mich 210, 325; 200 NW2d 628 (1972). Courts will respect the judgment of the Legislature unless there is a clear abuse of discretion. *Alan*, pp 326-327. Const 1963, art 9, § 18 is violated only when the state creates an obligation legally enforceable against it for the benefit of another. *Sprik v Regents of the Univ of Mich*, 43 Mich App 178, 190-191; 204 NW2d 62 (1972). [*Petrus v Dickinson Co Bd of Comm'rs*, 184 Mich App 282, 297; 457 NW2d 359 (1990).]

Plaintiffs complain that Act 90 violates the lending of credit provision because it requires the county to transfer to the WCAA all beneficial use and income of property acquired and used in conjunction with airport operations. With respect to the revenue bonds, however, the obligation followed the transfer of the revenues and no lending of credit occurred. Moreover, in enacting Act 90, the state did not create an obligation legally enforceable against the county for the benefit of the WCAA. See *Petrus, supra.*

With regard to the airport hotel bonds, which are secured by the county's pledge of full faith and credit, which obligation is not assumed by the WCAA under Act 90, plaintiffs conceded at oral argument that in the initial transaction they received value, $6.2 million, for the county's full faith and credit pledge. Given that value, the initial transaction did not constitute a lending of credit, a fact admitted by plaintiffs. This Court declines to find that Act 90 operates as a lending of credit regarding the airport hotel bonds where the initial transaction did not constitute a violation of that constitutional provision.

2

Plaintiffs also argue that Act 90 operates as a "taking" pursuant to Const 1963, art 10, § 2. The state and federal constitutions prohibit the taking of private property for public use without just compensation. US Const, Am V; Const 1963, art 10, § 2; *Adams Outdoor Advertising v East Lansing (After Remand)*, 463 Mich 17, 23; 614 NW2d 634 (2000). The paramount issue is whether the county's property is "private" for purposes of the Taking Clause.

Plaintiffs contend that their property is private because it is held in a "proprietary capacity" and cite *Mayor of Detroit v Park Comm'rs*, 44 Mich 602; 7 NW 180 (1880), for the proposition that the state may not take such municipal property. A "proprietary capacity" is defined as including the "functions of a city or town when it engages in a business-like venture as contrasted with a governmental function." Black's Law Dictionary (5th ed). Even considering the facts most favorably to plaintiffs, they have not shown that their operation of Metro Airport was in a private, or proprietary, capacity.[35] Further, plaintiffs never addressed defendants' contention that the property cannot be held in a proprietary capacity where the county is bound by law to pledge all revenues generated by Metro to the operation of Metro.

---

[35] As exhibits, plaintiffs submitted airport balance sheets and a budget from the airport department. Those documents, without more, do not demonstrate that the county operated Metro as a business-like venture. Also, to the extent that plaintiffs have cited case law from sister jurisdictions holding that airports are proprietary, we decline to follow those decisions from other jurisdictions because they are not binding. See *Adams Outdoor Advertising v East Lansing*, 439 Mich 209, 234, n 43; 483 NW2d 38 (1992).

The airport was established under the former act, which states that airports are to benefit the public. Additionally, the constitution itself provides that the Legislature may provide for the laying out, construction, and maintenance of airports, as it may with highways, thereby indicating that airports are held in a public rather than a proprietary capacity. See Const 1963, art 7, § 16.

H

Plaintiffs assert in count VII of their amended complaint that Act 90 is invalid under the Title-Object Clause. The Title-Object Clause provides: "No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title." Const 1963, art 4, § 24.

Plaintiffs allege that Act 90 implicitly amends the Revenue Bond Act (RBA), MCL 141.101 *et seq.*, because Act 90 does not indicate in its title that it amends the RBA (Amended Complaint, p 27, ¶ 108). Generally, the "purpose of the [title-object] clause is to prevent the Legislature from passing laws not fully understood, to ensure that both the legislators and the public have proper notice of legislative content, and to prevent deceit and subterfuge." *Phinney v Perlmutter*, 222 Mich App 513, 552; 564 NW2d 532 (1997). The goal of the clause is notice, not restriction of legislation. *Pohutski v Allen Park*, 465 Mich 675, 691; 641 NW2d 219 (2002).

In *People v Kevorkian*, 447 Mich 436, 453; 527 NW2d 714 (1994), our Supreme Court explained that three challenges may be brought against statutes on the basis of Const 1963, art 4, § 24: (1) a "title-body" challenge, which indicates that the body exceeds the scope of the title, (2) a "multiple-object challenge," which indicates that the body embraces more than one object, and (3) a "change of purpose challenge," which indicates that the subject matter of the amendment is not germane to the original purpose. In the instant case, plaintiffs have not indicated a specific challenge, so the following analysis examines all three types of challenges.

With regard to a title-body challenge, this Court has indicated that the title of an act must express the general purpose or object of the act. *People v Cynar*, 252 Mich App 82, 84; 651 NW2d 136 (2002). The revised title of Act 90 provides, with the added or amended language in italics:

> An act relating to aeronautics in this state; providing for the development and regulation thereof; creating a state aeronautics commission; prescribing powers and duties; providing for the licensing, or registration, or supervision and control of all aircraft, airports and landing fields, schools of aviation, flying clubs, airmen, aviation instructors, airport managers, manufacturers, dealers and commercial operation in intrastate commerce; providing for rules pertaining thereto; prescribing a privilege tax for the use of the aeronautical facilities on the lands and waters of this state; providing for the acquisition, development, and operation of airports, landing fields, and other aeronautical facilities by the state, by political subdivisions, *or by public airport authorities; providing for the incorporation of public airport authorities and providing for the powers, duties and obligations of public airport authorities; providing for the transfer of airport management to public airport*

*authorities, including the transfer of airport liabilities, employees, and operational jurisdiction;* providing jurisdiction of crimes, torts, and contracts; providing police powers for those entrusted to enforce this act; providing for civil liability of owners, operators and others; making hunting from aircraft unlawful; providing for repair station operators lien; providing for appeals from rules or orders issued by the commission; providing for the transfer from the Michigan board of aeronautics to the aeronautics commission all properties and funds held by the board of aeronautics; providing for a state aeronautics fund and making an appropriation therefor; prescribing penalties; and making uniform the law with reference to state development and regulation of aeronautics.

The gist of plaintiffs' contention is that Act 90 implicitly amends the RBA in such a manner that the purpose exceeds the scope of the quoted language.

Plaintiffs claim that the provisions of Act 90 conflict with the RBA, which provides in part that "[t]he bonds authorized hereunder shall not be subject to any limitations or provisions contained in the laws of the state of Michigan, pertaining to public corporations or in the charters of public corporations, as now in force or hereafter amended, other than as provided for in this act." MCL 141.111. Plaintiffs have not shown, however, that Act 90 subjects the airport bonds to limitations. Rather, Act 90 merely grants rights to PAAs for the issuance of bonds and their repayment and sets forth procedures regarding bonds, as illustrated below.

The provisions of Act 90 that plaintiffs assert are relevant[36] to the Title-Object Clause are §§ 120, 122-

---

[36] In addition to the specific provisions listed below, plaintiffs have cited other provisions generally. Because plaintiffs have failed to challenge those provisions specifically, we refuse to discuss them in detail.

125b.[37] Because the analysis of this issue best begins with § 122, we analyze the sections of Act 90 out of their numerical order. Section 122 of Act 90 permits the WCAA to issue self-liquidating bonds to assist in operating the airport. The RBA provides that a public corporation may issue bonds,[38] to make public improvements,[39] on transportation systems.[40] Thus, if the WCAA is a "public corporation" under Act 90, it may issue bonds to improve the airport pursuant to the RBA in such a manner that Act 90 would not amend the RBA and the body of Act 90 would not exceed the scope of its title.

The RBA defines a "public corporation," in part, as "an authority created by or under an act of the legislature," MCL 141.103(a). Therefore, the WCAA is a public corporation because the Legislature created it as a political subdivision of the local government that owns the airport, Act 90, § 110. The title of Act 90 indicates that PAAs have the authority to manage airports. The title need not refer to every detail of the act; rather, "[i]t is sufficient that 'the act centers to one main general object or purpose which the title comprehensively declares, though in general terms, and if provisions in the body of the act not directly mentioned in the title are germane, auxiliary, or incidental to that general purpose . . . .' " *Livonia v Dep't of Social Services*, 423 Mich 466, 501; 378 NW2d 402

---

See *Blue Cross Blue Shield, supra* at 24, n 23. In any event, we have examined those provisions and do not find them indicative of a violation of the Title-Object Clause.

[37] Plaintiffs list the provisions, but do not specifically state why those provisions implicitly amend the RBA.

[38] MCL 141.107.

[39] MCL 141.104.

[40] MCL 141.103(b).

(1985) (citations omitted). Where the management of the airport includes financial matters such as bonds, the bonds are sufficiently related to the act so that the title of Act 90 does not exceed its scope.

Section 120 provides in pertinent part: "The revenues raised by an authority may be pledged, in whole or in part, for the repayment of bonded indebtedness and other expenditures issued or incurred by the authority." Act 90, subsection 120(1). As indicated above, PAAs are "public corporations" that can issue bonds under the RBA. It therefore follows that PAAs have the power to pledge revenue to repay those bonds.

Section 123 provides that "[t]he authority may borrow money and issue municipal securities in accordance with an exercise of all of the powers conferred upon municipalities by the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821." Section 124 states: "All bonds or other evidences of indebtedness issued by an authority under this chapter, and the interest thereon, are free and exempt from all taxation within the state, except for transfer and franchise taxes." Those provisions simply do not reflect limitations on the bonds issued pursuant to the RBA, so plaintiffs' argument with respect to them fails.

Section 125 authorizes the legislative body of any local government that owns an airport over which operational jurisdiction has been transferred to pledge its full faith and credit behind any obligation or evidence of indebtedness of the PAA or advance funds or convey property to the PAA. Plaintiffs do not explain how that section operates as an amendment of the RBA. Section 125a states that PAAs may, to effec-

tively manage their debt service, agree to an interest rate exchange provided that the agreement states that it is "payable from general funds . . . from any available money or revenue sources . . . securing the obligation or evidence of indebtedness in connection with the agreement." Finally, section 125b contains five subsections regarding the liability of the PAAs for the outstanding bonds, notes, or other indebtedness.

All these sections set forth procedures regarding airport indebtedness, which includes bonds. To require the title of Act 90 to reflect all those procedures would result in an unworkably long and unwieldy title. As indicated in *Livonia v Dep't of Social Services, supra,* a general title is sufficient; the title need not contain every detail of the act.

Plaintiffs' reliance on *Blades v Bd of Water Comm'rs of Detroit,* 122 Mich 366; 81 NW 271 (1899), is misplaced. The Court described the amended legislation in *Blades* as "radical" and "virtually abolishing the water rate system." *Id.* at 378. The amending provision changed the system from water rates to taxation by taxing businesses while providing free water to the majority of the city. The Court held that the Title-Object Clause was violated because the title did not reflect the rate system changes but only reflected the transfer of authority:

> The fair inference to be drawn from this title is that the object is to take away the possession of the waterworks, and its control and management, from the board of water commissioners, and transfer them to the city, and that the body of the act would contain only such provisions as were essential to accomplish that object. [*Id.* at 379.]

In contrast to *Blades*, here the title of Act 90 reflects its purpose—to provide for the transfer of airport management to PAAS. Plaintiffs have not shown that the body of Act 90 contains provisions that are not essential to accomplish that object. Further, plaintiffs have not shown that the amendments of Act 90 represent the "radical" type of changes present in *Blades*.

Plaintiffs also direct this Court to the lengthy discussion of amendment by implication in *Alan v Wayne Co*, 388 Mich 210; 200 NW2d 628 (1972). Distinguishing this case from *Alan*, however, is that the *Alan* Court determined that the legislation at issue there did, in fact, purport to create an exception to the RBA without expressing that in the title. *Id.* at 270. The Court then embarked on an extended analysis[41] of the Legislature's duties where it intends to amend a previous act. *Id.* at 270-288. In this case, as previously discussed, Act 90 does not amend the RBA. Indeed, as shown, it comports with that act. Accordingly, plaintiffs' arguments fail under *Alan*.

With respect to the "multiple-object challenge," which indicates that the body embraces more than one object, the reason for limiting the objective of an act to a single purpose is to avoid bills addressing "diverse subjects that have no necessary connection." *Mooahesh v Dep't of Treasury*, 195 Mich App 551, 564; 492 NW2d 246 (1992), disagreed with on other grounds in *Silverman v Univ of Michigan Bd of Regents*, 445 Mich 209; 516 NW2d 54 (1994). A statute

---

[41] The analysis came complete with a footnote detailing the history of the printing press to illustrate the principle that constitutional duties may not be avoided merely because "it might be a lot of work to comply with the constitution." *Id.* at 283 and n 55.

may authorize activities that further the general purpose of the act without violating the one-object constitutional limitation. *Kuhn v Dep't of Treasury*, 384 Mich 378, 388; 183 NW2d 796 (1971).

One purpose of Act 90 was to facilitate the operation of Michigan airports by creating PAAs to manage airports that have a certain number of enplanements. In managing the airport, the PAA necessarily must raise revenues, which can be done in a variety of ways. See generally *Mooahesh, supra* at 566. That one method of raising revenue is the issuance of bonds does not give rise to the conclusion that Act 90 impermissibly embraces more than one object and amends the RBA.[42] Where the title of Act 90 indicates the broad purpose of providing for the control and operation of airports, the title of Act 90 does not exclude the issuance of bonds, particularly where the title refers to "the acquisition, development, and operation of airports." The act may include all matters relevant to its object, as well as all provisions that directly relate to, carry out, and implement the principal object. *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 465; 208 NW2d 469 (1973). The aims of the RBA and Act 90 are not so diverse that they have "no necessary connection," *Tucker v Allied Chucker Co*, 234 Mich App 550, 558; 595 NW2d 176 (1999) (citation omitted), so that we cannot conclude that the title of Act 90 violates the multiple object principle.

With regard to the "change of purpose challenge," which examines whether the subject matter of the

---

[42] Moreover, as pointed out by the county defendants, the Michigan Aeronautics Code already provided for the issuance of bonds before the enactment of Act 90. See MCL 259.131.

amendment is germane to the original purpose, plaintiffs have not shown that the subject of Act 90 is unrelated to the original purpose of the law. The purpose of the Michigan Aeronautics Code, of which Act 90 is a part, appears to be to provide uniform guidelines for the operation of Michigan airports. Act 90 relates to the management and operation of Michigan airports. The fact that Act 90 also creates PAAS to do so does not represent a change in the general purpose of the original law.

Finally, plaintiffs contend that Act 90 violates the Title-Object Clause because it affects only Wayne County, although Wayne County is not named in the title (Amended Complaint, p 28, ¶ 110). Although Metro Airport currently is the only airport affected by Act 90, the statute does not limit its application to Metro Airport alone. Act 90 is based on the number of enplanements; presumably, another airport in the future could meet the requisite number of enplanements so as to be subject to Act 90. Accordingly, where Act 90 may at some future date apply to an additional airport, the title of Act 90 does not violate the Title-Object Clause by failing to identify that it currently applies only to Metro Airport.

I

In count VIII of their complaint, plaintiffs argue that Act 90 is constitutionally unsound because it is a local or special act that was not approved by a majority of the electors voting in the county. The constitutional provision at issue states as follows:

The legislature shall pass no local or special act in any case where a general act can be made applicable, and

whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected. Any act repealing local or special acts shall require only a majority of the members elected to and serving in each house and shall not require submission to the electors of such district. [Const 1963, art 4, § 29.]

Our Supreme Court recently discussed the local act provision in *Michigan v Wayne Co Clerk*, 466 Mich 640; 648 NW2d 202 (2002). The statute at issue in that case, 2002 PA 432, provided that a city of over 750,000 residents as determined by federal census, with a city council of nine at-large members, should place a particular question on the ballot for the election of August 6, 2002. The statute did not refer to Detroit by name; however, only the city of Detroit met the population criterion. The Detroit City Council argued that Act 432 violated Const 1963, art 4, § 29 because it was a local act that applied only to Detroit.

Our Supreme Court first noted that it previously had upheld population-based statutes where other cities or counties could qualify for inclusion if their populations changed. *Wayne Co Clerk*, *supra* at 642. The Court then observed that a statute fails as a general act where it cannot apply to other units of government. *Id.* at 643. Applying this analysis, our Supreme Court stated:

In this case, the statute plainly fails to qualify as a general act. Even if another city reaches a population of 750,000, and has a nine-member at-large council, Act 432 would not apply because of its requirement that the proposition appear on the ballot at the August 6, 2002, election. No

other city can meet that requirement because there will be
no new census before that date. [*Id.*]

The requirement of Act 90 of a certain number of
enplanements may be analogized to the population
requirement of Act 432. Unlike Act 432 in *Michigan v
Detroit City Council*, however, here the enplane-
ments requirement of Act 90 does not contain a time
deadline. Thus, other airports can qualify for inclu-
sion under Act 90 if their number of enplanements
increases to the requisite level on some future date.

We also examine the analysis regarding population-
based local acts included in *Airlines Parking, Inc v
Wayne Co*, 452 Mich 527, 550-551; 550 NW2d 490
(1996) (CAVANAGH, J., dissenting):

"The principles upon which [population-based laws] have
been sustained as general laws or defeated as local acts are
well established in this State and elsewhere.

"The first test to be applied is whether population has a
reasonable relation to the purpose of the statute. In *Mulloy
v Wayne Co Bd of Supervisors*, 246 Mich 632, 635 [225 NW
615 (1929)], the distinction is pointed out:

" 'Clearly, because of its provision as to population, the
act applies to Wayne county only. If it is a reasonable and
logical basis of classification, considering the subject of leg-
islation, unquestionably a specified population may be
made the test of the applicability of a general legislative act;
and under such conditions that act will not be construed to
be invalid as local legislation. But where the subject of leg-
islation is such that population has no obvious relation to
the purpose sought to be accomplished, an attempt to make
the application of the legislative act dependent on the popu-
lation is unwarranted and amounts to local legislation.
*Attorney General ex rel Dingeman v Lacy*, 180 Mich 329
[146 NW 871 (1914)].'

*    *    *

"The second test of a general law, based upon population, is that it shall apply to all other municipalities if and when they attain the statutory population. It must have—'an open end through which cities are automatically brought within its operations when they attain the required population.'" [Quoting *Dearborn v Wayne Co Bd of Supervisors*, 275 Mich 151, 155-156; 266 NW 304 (1936).]

Turning to the case at bar, the first test is whether the number of enplanements has a reasonable relation to the purpose of the statute. The legislative purpose behind Act 90 was to address management and contracting issues at Metro Airport (see House Legislative Analysis); the purpose was met by the creation of PAAs to manage Michigan's busiest airports. The number of enplanements has a reasonable relation to the purpose of Act 90, for it would be irrational to require the appointment of a PAA to manage a tiny airport serving a small population with an insignificant number of enplanements. Thus, the number of enplanements has an obvious relation to the purpose of the legislation.

Additionally, Act 90 meets the second test outlined above. Other Michigan airports, when they reach the requisite number of enplanements, will qualify under the statute. Act 90 consequently has "an open end through which [airports] are automatically brought within its operations when they attain the required [enplanements]."

Plaintiffs, however, contend that Act 90 automatically creates only the WCAA, while all other airport authorities under Act 90 are created by the vote of the legislative body of the local unit that owns the air-

port, citing subsection 110(2). That section provides in part:

> (2) For a local government that owns or operates a qualified airport on the effective date of this chapter, there is created an authority on the effective date of this chapter. *For a local government that operates an airport that becomes a qualified airport after the effective date of this chapter, there is created an authority on the date the airport becomes a qualified airport.* [Act 90, subsection 110(2) (emphasis supplied).]

The plain language of the statute belies plaintiffs' argument: once an airport becomes a "qualified airport," an authority automatically is created. With regard to the vote of the legislative body, plaintiffs apparently are confusing subsection 110(2) with the section governing airports that are not "qualified" airports, as illustrated in subsection 110(3):

> (3) A local government that owns or operates an airport that is *not a qualified airport* may, by resolution, declare its intention to incorporate an authority. . . . [I]f the legislative body of the local government intends to proceed with the incorporation of the authority, it shall adopt, by majority vote of its members, a resolution incorporating the authority. [Act 90, subsection 110(3) (emphasis supplied).]

Thus, the legislative body may vote for an authority only in relation to an airport that is not a qualified airport. As previously discussed, Act 90 is open-ended in such a manner that in the future another airport could become qualified so that the statute may apply someday to an airport other than Metro. Where plaintiffs acknowledge that another airport will qualify in the future and where Act 90 does not have a cutoff

date similar to that in *Detroit City Council, supra,* plaintiffs have not shown that Act 90 is a local act.

J

Finally, in count IX of the amended complaint, plaintiffs assert that the Federal Aviation Act, 49 USC 47101 to 47153, preempts Act 90. We hold that no conflict preemption exists where plaintiffs can comply with Act 90 by transferring operational jurisdiction to the WCAA and at the same time meet their assurances obligation under federal law by retaining ownership of Metro Airport.

As a threshold matter, we reject defendants' assertion that no private cause of action exists here, citing, inter alia, *Northwest Airlines, Inc v Kent Co,* 955 F2d 1054, 1058-1059 (CA 6, 1992).[43] A court's decision regarding private rights of action must be consistent with legislative intent while furthering the Legislature's purpose in enacting the statute. *Gardner v Wood,* 429 Mich 290, 301; 414 NW2d 706 (1987). Although Congress apparently intended that no private right of action exist under 49 USC 47101 *et seq.,* that does not defeat plaintiffs' claim here that Act 90 is preempted by the federal law. Plaintiffs' action is not brought pursuant to federal aviation law; rather, they are asserting that Act 90 is unsound under the state and federal constitutions.

Under the Supremacy Clause, US Const, art VI, cl 2, federal law preempts state law in three circumstances: (1) where Congress has expressed an intent to preempt state law, (2) where state law regulates

---

[43] Note that *Northwest Airlines* references 49 USC 2210, which was the previous version of the statute plaintiffs reference here, 49 USC 47107.

conduct in a field that Congress intended to occupy exclusively, and (3) where state law actually conflicts with federal law. *Grand Trunk W R Co v City of Fenton*, 439 Mich 240, 243-244; 482 NW2d 706 (1992). A general presumption exists against federal preemption. *Duprey v Huron & E R Co, Inc*, 237 Mich App 662, 665; 604 NW2d 702 (1999). Courts will find preemption only where it is the clear and unequivocal intent of Congress. *Martinez v Ford Motor Co*, 224 Mich App 247, 252; 568 NW2d 396 (1997).

Plaintiffs suggest that Act 90 presents a "textbook case" of "conflict preemption," which occurs where a state law is impliedly preempted because it actually conflicts with federal law. Thus, a state law is preempted where a private party cannot possibly comply with both state and federal requirements. *English v General Electric Co*, 496 US 72, 78-79; 110 S Ct 2270; 110 L Ed 2d 65 (1990). "Congressional intent is the cornerstone of preemption analysis." *Ryan v Brunswick Corp*, 454 Mich 20, 27; 557 NW2d 541 (1997). The determination of preemption involves statutory interpretation, which is a question of law. *Konynenbelt v Flagstar Bank, FSB*, 242 Mich App 21, 27; 585 NW2d 300 (2000).

Plaintiffs state that the county has made assurances to the FAA when applying for various federal airport grants. They argue that those assurances are binding on Wayne County, as a "sponsor"[44] of the grant, see 49 USC 47108(a). Plaintiffs assert that Act 90, subsection

---

[44] A "sponsor" is defined as "a public agency [e.g., a political subdivision] that submits to the Secretary under this subchapter an application for financial assistance . . . ." 49 USC 47102(15), (19).

117(1)(c),[45] which requires the county to transfer all grant agreements to the WCAA, would require the county to breach its assurances as a sponsor of the federal grant agreements.

Plaintiffs refer to the following assurance as the general type of assurance they have given to the FAA over the years:

> 5(f). If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor *will reserve sufficient rights and authority to insure that the airport will be operated and maintained in accordance with Title 49,* United States Code, the regulations and the terms, conditions and assurances in the grant agreement and shall insure that such arrangement also requires compliance therewith. [62 Fed Reg 29764 (emphasis supplied).]

---

[45] Subsection 117(1)(c) provides that on the approval date, the following shall occur:

The authority assumes, accepts, and becomes liable for all of the lawful obligations, promises, covenants, commitments, and other requirements in respect of the airport of the local government that owns the airport under the operational jurisdiction of the authority, whether known or unknown, contingent or matured, but excepting any full faith and credit pledge of the local government in respect of bonds issued by the local government for airport purposes, and shall perform all of the duties and obligations and shall be entitled to all of the rights of the local government in respect of the airport under any ordinances, agreements, or other instruments and under law. Consistent with this chapter, this assumption includes, and there shall be transferred to the authority, all licenses, permits, approvals or awards related to the airport, all grant agreements, grant pre-applications, the right to receive the balance of any funds payable under the agreements, the right to receive any amounts, including PFCs, payable to the local government on the approval date and amounts paid to the local government after the approval date, as well as the benefit of contracts and agreements, and all of the local government's duties, liabilities, responsibilities and obligations as sponsor of the airport, except for any obligation or liabilities contested in good faith by the authority.

Thus, plaintiffs state that the transfer of airport operations to the WCAA precludes their reservation of authority to ensure that Metro will be operated in accordance with federal law.

Plaintiffs are correct that the county remains responsible for ensuring that federal guidelines are met. In a letter dated August 7, 2002, from David Bennett, FAA Director, Officer of Airport Safety and Standards, to plaintiff Solomon, Bennett stated that Wayne County is not being relieved of its obligations with regard to outstanding assurances. The sponsor here is the county. Under the act, the county, through the county executive and the commission, appoints a majority of the WCAA board members. Further, the statute itself requires that the WCAA assume all the county's duties, liabilities, responsibilities, and obligations as sponsor of the airport.[46] Thus, we conclude that the county has reserved sufficient rights and authority to ensure that the airport will be operated and maintained in accordance with federal requirements.

Further supporting the conclusion that the county has retained sufficient rights and authority pursuant to federal law is the fact that Act 90 requires that the FAA approve of the transfer of the grant agreements before such a transfer may occur.[47] The FAA approved the transfer to the WCAA, as illustrated in a letter from

---

[46] There is a statutory exception that presumably applies to obligations contested in good faith with the FAA.

[47]

> "Approval date" means the effective date of the issuance by the federal aviation administration to the authority assuming operational jurisdiction of an airport of a certificate under part 139 of chapter 14 of the code of federal regulations with respect to the airport, and the concurrence by the FAA of the designation of the authority as a sponsor of the airport, *including the* FAA's approval

Bennett, dated August 7, 2002, to the Wayne County Executive.

Plaintiffs, however, argue that the county also must approve such a transfer, stating that the federal statute "strongly suggests that such a transfer is prohibited without Wayne County's consent." Plaintiffs do not cite a particular section of the federal act with that plain language. Instead, plaintiffs point to 49 USC 47108(a), which indicates that the FAA's offer of a grant to a sponsor becomes a binding agreement once the sponsor accepts in writing. Contrary to plaintiffs' assertion, that section does not hold that a sponsor must approve when legislation transfers grant agreements subject to FAA approval. Accordingly, plaintiffs' preemption argument fails.

## CONCLUSION

In sum, we decline to rule on plaintiffs' Headlee claim as related to nontransferring employees and dismiss that claim without prejudice. Having resolved all remaining claims in favor of defendants, we dismiss plaintiffs' remaining claims with prejudice. Given the resolution of the above issues, we decline to further address the cross-complaint.

---

of the assignment of existing grant agreements to the authority. [PA 90, subsection 109(c) (emphasis supplied).]